### In re MUSHROOM TRANSPORTATION COMPANY, INC., et al., Debtors

### Jeoffrey L. Burtch, Trustee, Plaintiff,

### v.

### Jonathan Ganz, et al., Defendants.

**Bankruptcy No. 85–02575.**
**Adversary No. 92–1043.**

United States Bankruptcy Court,
E.D. Pennsylvania.

May 3, 2007.

Pace Reich, Pace Reich P.C., Elkins Park, PA, for Debtors.

George R. Tsakataras, Willington, DE, Trustee, for Plaintiff.

## OPINION

BRUCE FOX, Bankruptcy Judge.

The chapter 7 trustee, Jeoffrey L. Burtch, in his amended complaint, asserts three alternate claims against defendants Pincus, Verlin, Hahn & Reich, P.C.; Pincus, Reich, Hahn, Dubroff & Ganz, P.C.; and Pincus, Verlin, Bluestein, Hahn & Reich, P.C. (hereinafter "Pincus"). In essence, the trustee demands judgment in the amount of funds misappropriated by Jonathan Ganz, who had been a Pincus law firm shareholder, along with funds deposited with the Pincus firms, for which the firms allegedly cannot account. The trustee asserts this combined amount exceeds $1 million.

Specifically, in Count I of the amended complaint, the trustee alleges that the debtors' property was entrusted to the Pincus firms and they have a duty to "turnover" estate property to the trustee, pursuant to 11 U.S.C. § 542 or § 543. In Count II, the trustee maintains that the Pincus law firms were "escrow agents" acting as fiduciaries for the debtors' estates. By failing to pay the liquidation proceeds purportedly entrusted to them, the trustee alleged that they have "breached their dut(ies)" to the debtors. And in Count VI, the trustee contends that the Pincus law firms breached a contract—which contract arose via stipulation to place funds in escrow—and therefore are liable for missing estate assets that should have been held in escrow.

Three principal issues were raised during the trial. First, are the Pincus corporate law firms liable for Ganz's illegal activities? Second, if they are liable, what are the provable damages? And third, did the trustee wait too long to commence this litigation against the Pincus law firms, and so have his claims barred by the statute of limitations?

A trial took place over five days,[1] with more than one hundred exhibits admitted.

---

1. The citation 1 N.T. refers to the first day of testimony, 2 N.T. to the second, and 3 N.T. to

The parties thereafter submitted post-trial proposed factual findings and legal conclusions.[2] Upon review of all the evidence, including the exhibits admitted and the testimony offered, admissions made in the pleadings, plus those documents in the court file for which judicial notice is appropriate under Fed.R.Evid. 201,[3] *see, e.g., In re Indian Palms Associates, Ltd.,* 61 F.3d 197, 204 (3d Cir.1995); *Maritime Elec. Co., Inc. v. United Jersey Bank,* 959 F.2d 1194, 1200 n. 3 (3d Cir.1991); *Mesirow ·v. Duggan,* 240 F.2d 751, 756–57 (8th Cir.1957), I find that the following facts were proven.

## I.

1. On June 25, 1985, Mushroom Transportation Company, and its affiliated companies—Penn York Realty Co., Leazit Inc., Robbey Realty, Inc., and Trux Enterprises, Inc.—filed voluntary petitions in bankruptcy under chapter 11, with the goal of reorganizing and exiting chapter 11 as going concerns. Exs. P–6 to P–10, P–200.

2. When it filed its bankruptcy petition, Mushroom was a regulated ICC carrier, which leased terminals for its operations. Ex. P–18 at 1069; 2 N.T. at 11. Some of the leased terminals used by Mushroom were owned by the affiliated companies. Ex. P–18 at 1089–90; Ex. P–22 at 1222; Ex. P–23 at 1235; Ex. P–24 at 1248; 2 N.T. at 11–12. The affiliates had no carrier operations. Exs. P–21 to P–24.

3. Mushroom's officers at the time of its bankruptcy filing were: Richard W. Cutaiar, President; Robert F. Cutaiar, Vice President; Michael C. Arnold, Executive Vice President; Jerry A. LuCante, Vice President; Walter C. Lopez, Vice President and Secretary; and Robert B. Cutaiar, Treasurer. Ex. P–18 at 1092.

4. The officers of Leazit were Jacques R. Cutaiar and William T. Mecouch. Ex. P–21 at 1204. The officers of Trux Enterprises were Robert F. Cutaiar, Mary F. Cutaiar, Robert B. Cutaiar and Robert G. Cutaiar. Ex. P–22 at 1218. The officers of Penn York were Robert F. Cutaiar, Richard W. Cutaiar and Robert G. Cutaiar. Ex. P–23 at 1231. And the officers of Robbey Realty were Robert F. Cutaiar, Richard W. Cutaiar and Robert G. Cutaiar. Ex. P–24 at 1244.

5. Michael Arnold was an officer only of Mushroom, and was involved in overseeing its operations. 1 N.T. at 31. His duties at Mushroom were those of chief operating officer "directly handling the daily operations of the company." Ex. P–19 at 1198. He was a law school graduate, and at the time of Mushroom's bankruptcy filing had been employed by the company

---

the third, etc.

2. Although more than 200 exhibits were marked for identification at trial, not all were admitted in evidence. For example, the defendants only offered one exhibit, Ex. D–13, in evidence. 5 N.T. at 149–50. The plaintiff withdrew some of his trial exhibits and so those were not admitted. *See, e.g.,* 3 N.T. at 111 (withdrawing Ex. P–92); 3 N.T. at 180 (withdrawing Ex. P–144). Other exhibits were objected to and some objections were sustained. *See, e.g.,* Memorandum and Order Resolving Evidentiary Objections, dated September 29, 2005.

The factual findings listed below consider only those exhibits admitted in evidence. To the extent that the plaintiff submitted pro-

posed findings of fact based upon an exhibit not admitted (e.g., Plaintiff's proposed findings # # 35–37, 46–49 .rely upon Ex. D–15, which was not offered in evidence; proposed finding # 61 relies upon withdrawn exhibit # 92; proposed finding # 111 relies upon Ex. P–144, which was withdrawn, and upon Ex. D–15, which was not offered in evidence), these proposals were not accepted unless supported by other evidence in the record. *E.g.,* Plaintiff's proposed finding # 88(a) (referring to Ex. P–131, which exhibit was withdrawn at trial but was duplicated by Ex. P–132, which was admitted).

3. To the extent such documents on file could be considered hearsay, I have not considered them for the truth of any assertions.

for eight years. *Id.* When Mushroom filed its bankruptcy petition, Mr. Arnold's salary was $920 per week. *Id.*

6. Robert B. Cutaiar was Mushroom's treasurer and chief financial officer. He was responsible, *inter alia,* for "all banking arrangements within the company system." Ex. P–19, at 1198. He had been employed by Mushroom since 1961. *Id.*

7. On June 28, 1985, the separate chapter 11 cases of Mushroom and its affiliates were ordered jointly administered.[4] Ex. P–16 at 1065B; P–200 (docket entries # # 7–10). Furthermore, an official committee of unsecured creditors was appointed in the Mushroom bankruptcy case. *Id.* (docket entry # 11). The creditors' committee engaged the law firm of Booth, Marcus & Pierce as its counsel. *Id.* (docket entry # 210).

8. On July 3, 1985, Mushroom and all of its affiliate debtors were authorized to engage the law firm of Pincus, Verlin, Hahn & Reich, P.C. to represent them as chapter 11 debtors in possession. 1 N.T. at 33. Exs. P–11 to 15; P–200 (docket entry # 18). The Pincus firm received compensation for its services to the chapter 11 debtors in possession at least through June 1989. Ex. P–200 (docket entry # 1255).

9. At the time of this engagement, the Pincus firm was a professional corporation with Jonathan Ganz, Esquire as one of its shareholders but not one of its officers. 2 N.T. at 168.

10. Both Arnold and Ganz graduated from Villanova Law School. Ex. P–19 at 1198. While at law school Arnold met Ganz and even took a bankruptcy class with him. 2 N.T. at 16–17. It was Arnold

who arranged for Mushroom to engage the Pincus law firm, and Pincus was chosen because of Arnold's association with Ganz and because of the firm's bankruptcy expertise. 1 N.T. at 32, 49. Arnold obtained his law license in 1978, but that license was revoked in 1995. 2 N.T. at 10. In 1996, Arnold pled guilty to embezzling Mushroom funds while serving as Mushroom's bankruptcy trustee. 2 N.T. at 57.

11. Arnold viewed his relationship with Ganz as more than simply attorney-client. 2 N.T. at 55. However, he had no social relationship with Ganz, at least prior to engaging his firm to represent Mushroom in its bankruptcy case. Ex. P–182 at 11. After the engagement, Arnold and Ganz became friendlier, sharing season baseball tickets. 2 N.T. at 55–56.

12. After the Pincus law firm was engaged by Mushroom and its affiliates for the bankruptcy representation, Ganz was considered by the firm to be the originating attorney for the Mushroom clients. 2 N.T. at 190; 4 N.T. at 132, 146.

13. Within the Pincus law firm, Ganz either requested or agreed that Pace Reich, another attorney shareholder with more bankruptcy experience than Ganz, be in charge of the reorganization efforts of the Mushroom bankruptcy cases. 4 N.T. at 146.

14. When Mushroom filed for bankruptcy relief, it estimated owing about $4.5 million to Continental Bank. Ex. P–18 at 1119. Continental held a security interest in Mushroom's receivables, equipment and real estate, *id.,* and the affiliate companies (except for Leazit) had guaranteed that debt and placed their own assets as collat-

---

4. Joint administration is permitted by Fed. R. Bankr.P. 1015(b) and is quite different from substantive consolidation. The former is merely an administrative convenience so that a party need not file identical pleadings in five different bankruptcy cases. The latter com-

bines the assets and liabilities of the different bankruptcy cases into one case. *See generally, e.g., In re Genesis Health Ventures, Inc.,* 402 F.3d 416, 423 (3d Cir.2005); *In re Deltacorp, Inc.,* 179 B.R. 773, 777 (Bankr.S.D.N.Y. 1995).

eral. Exs. P–22 at 1220; P–23 at 1233; P–24 at 1246.

15. Shortly after Mushroom and its affiliates filed their chapter 11 petitions, they entered into agreements with Continental for the continued use of cash collateral and for postpetition loans. Exs. P–55 to 57. Among the terms of those agreements was the requirement that the debtors deposit the proceeds of their receivables in Continental Bank accounts. *Id.* After filing for chapter 11 bankruptcy, Mushroom opened debtor in possession bank accounts, first at Fidelity Bank and later at Continental Bank. 2 N.T. at 19–20.

16. About six months after they filed chapter 11 cases (by the end of 1985), Mushroom and its affiliates decided that they would be unable to reorganize as operating entities. On or about January 10, 1986, Mushroom decided to cease operations and simply liquidate all of its assets and those of its affiliates, but to do so in chapter 11 rather than in chapter 7. 1 N.T. at 33.

17. After Mushroom made its decision to liquidate its assets and those of its affiliate companies in chapter 11, and to cease operations, Ganz became the Pincus attorney in charge of overseeing the liquidating chapter 11 cases, as Ganz purportedly had more experience in that scenario than Reich. 5 N.T. at 146. Thus, by early 1986 Ganz became the lead Pincus attorney on the Mushroom bankruptcy cases. 2 N.T. at 138, 188; 5 N.T. at 147; Ex. P–182 at 213.

18. The Pincus firm did not have any supervision systems concerning Ganz's handling of the Mushroom bankruptcy cases. 2 N.T. at 189. As Ganz expressed it: "One of the nice parts of working for the firm was that you generally had a lot of independence." Ex. P–182 at 60.

19. On or about February 14, 1986, the official committee of unsecured creditors filed a motion to substantively consolidate the assets and liabilities of Mushroom and its affiliate entities (as well as requesting marshaling). Exs. P–200 (docket entry # 361); P–208.[5] That motion was opposed by various parties, including certain shareholders of the affiliate debtors, the Estate of William C. Cutaiar and the Internal Revenue Service. The opposition believed that the assets of the affiliates exceeded their liabilities to Continental, and that substantive consolidation would render those affiliate assets liable for Mushroom's pension plan liabilities. 1 N.T. at 35–36; Exs. P–51; P–200 (docket entry # 418).

20. Arnold testified that Mushroom and its affiliates were unable to file post-bankruptcy tax returns while this motion for substantive consolidation was pending. 1 N.T. at 38. This testimony was not completely persuasive. While the outcome of the consolidation motion could have an effect upon tax liabilities, the debtors could have filed tax returns during the pendency of the motion, with an intention to amend later if necessary. And since postpetition returns would have to be filed eventually, the debtors needed to obtain and retain requisite information during the bankruptcy case to prepare for those tax returns whenever they were actually filed. Moreover, there was no evidence that the debtors, who had retained an accountant, had even sought extensions from taxing authorities. Thus, Mushroom and its affiliates appear simply to have ceased preparing or filing any postpetition tax returns.

21. On February 24, 1986, Arnold sent a letter to creditor committee counsel esti-

5. Ex. P–167 lists a different date for the filing of this motion. I have used the date found on the docket.

mating the real estate, personal and other assets available for liquidation. Ex. P–31. He requested that the committee counsel attempt to verify the amount of Continental Bank's secured claim. *Id.* There was no evidence at trial whether the committee counsel responded to this request.

22. On February 27, 1986, Mushroom's application that Arnold be appointed "special liquidation consultant" was approved. Ex. P–32. Arnold then acted in that capacity for the affiliated debtors as well as Mushroom. 2 N.T. at 27. His duties were to "oversee the liquidation and collection of the assets of Mushroom and its affiliates." 2 N.T. at 27. His consultant compensation was fixed at $75,000, plus expenses (*i.e.*, more than he was earning as Mushroom's vice-president).

23. Although the order approving Arnold's appointment specified that it was to last only for six months unless further extended by the court, and although no further request to continue this engagement was ever noticed or approved, Arnold continued in this capacity in 1988 and 1989, and possibly into 1990, and was paid $300 per day for his services. 2 N.T. at 27–28, 38, 46.

24. During 1986 and 1987, Arnold was paid as liquidating consultant from Mushroom's debtor in possession account. 2 N.T. at 29. Apparently, after the funds in that account were spent, Arnold was paid from other sources. In 1989, Arnold was paid by Ganz via a check from a Provident Bank account titled in the name "Estate of Mushroom Transportation, Debtor in Possession." Ex. P–182 at 41, 43, 62–63. Arnold estimated receiving $50,000 in per diem pay, paid from funds in this or other accounts. 2 N.T. at 46–47. Arnold did not ask Ganz about the source of funds for these payments. Ex. P–182 at 43.

25. In 1986, Mushroom and its affiliate companies began to sell their real estate assets, using various Pincus attorneys for legal services. *See, e.g.,* Exs. P–36, P–40, P–48; 2 N.T. at 35, 5 N.T. at 6–8. Arnold attended some closings on behalf of the sellers. 2 N.T. at 32–33. At least some seller deposits were placed in Pincus's escrow account and distributed appropriately upon closing. 2 N.T. at 35; Exs. P–39; P–65–67, P–182 at 201–203.

26. Upon the sale of individual Mushroom and affiliate assets, Continental was paid the net proceeds in reduction of its secured claim against the debtors. 2 N.T. at 33; *see, e.g.,* Exs. P–36; P–48; P–55. For at least some of the sales, *e.g.,* the Byberry Road Terminal, Continental was directed in August 1986 to escrow a portion of the proceeds in an interest-bearing account pending resolution of the substantive consolidation and marshaling motion then outstanding. Ex. P–52.

27. On July 10, 1986, Ganz wrote to Continental's counsel seeking information pertaining to a Mushroom bank account statement. Ex. P–42. This account statement was addressed to Robert B. Cutaiar on behalf of Mushroom. *Id.* Ganz sent a copy of this letter to Arnold, probably because of Arnold's role in overseeing the liquidation of Mushroom's assets.

28. On July 24, 1986, Ganz sent a letter to Continental's counsel, enclosing a check representing the proceeds of the sale of a terminal. Ex. P–44. A copy of this letter was also sent to Arnold, probably due to his role in the liquidation process.

29. On July 31, 1986, Continental informed Arnold that it would open an escrow account and place the sale proceeds from the Mushroom cases into that account. The bank requested that a form be signed by Mushroom, which form was signed by Robert B. Cutaiar as treasurer and returned to Continental. Ex. P–43.

30. On August 18, 1986, a court order was signed authorizing a Mushroom affili-

ate to sell realty in Kennett Square to Robert B. Cutaiar and others. Ex. P–48.

31. Prior to October 1986, it is likely that either Arnold or Robert B. Cutaiar was receiving monthly bank statements from Continental concerning the escrow account. However, on October 7, 1986, Continental Bank was instructed that monthly bank statements regarding the escrow account it held should no longer be mailed to Mushroom. Ex. P–27. The document giving this instruction is signed by an officer of Continental Bank, and there was no evidence to determine whether this "statement hold request" came from Mushroom, from the Pincus law firm, or from this Continental officer.

32. Other than an oblique reference to a communication between Arnold and Continental counsel, which reference was made in a February 1987 letter, there was no evidence offered that Arnold or Robert B. Cutaiar, both of whom knew of this Continental escrow account from the July 1986 correspondence, ever sought further monthly information from Continental regarding the escrow account balance, or complained to Continental about the absence of monthly statements.

33. On February 12, 1987, Arnold wrote to Ganz stating that Mushroom had closed its Philadelphia office on Hunting Park Avenue, and that its records would be transferred to the Kennett Square realty previously purchased by Robert B. Cutaiar (and others) "for a new business venture." Ex. P–70; see also 1 N.T. at 42 (suggesting that the move of Mushroom records occurred before the end of 1986). Arnold requested information from Ganz concerning the status of the case, including the funds held by the Pincus law firm and the amount still owed by Mushroom to Continental and "an accounting" for a personal property sale that took place in August 1986. Id. He added that he anticipated a "further reduction of my involvement

[with Mushroom] in March [1987] so I would like to clear up as much of the ambiguity as possible by then." Id. A copy of this letter was sent to Robert B. Cutaiar. Id.

34. Arnold testified that he decided in early 1987 to reduce his involvement with the Mushroom bankruptcy cases because Mushroom was no longer operating, and he believed that substantially all of the assets had been liquidated. 1 N.T. at 40. That testimony was not completely accurate. At the time Arnold sent this letter, there were additional assets to be liquidated. See Exs. P–78, P–84, P–93 (concerning sales of assets after February 1987); Ex. P–91 (dispute involving a letter of credit). Moreover, after February 1987, Arnold participated in the resolution of various priority claims. 1 N.T. at 41; see also Declaration of Michael Arnold, filed January 27, 1988 (concerning employee claims).

35. I find that by early 1987, while there was still considerable work needed to complete these bankruptcy cases, Arnold and the other officers of Mushroom and its affiliates realized that the operating entity was out of business, the liquidation of assets probably would not realize a distribution to shareholders, and that Arnold and other Mushroom officers believed it in their financial best-interests to earn income from other ventures. In other words, by early 1987, all the Mushroom officers realized that they would receive little, if any, income from the pending chapter 11 cases and found other employment or income sources.

36. There was no notice given to the court that Mushroom was no longer located at the Hunting Park address. Thus the court docket continued to reflect the old address. Ex. P–200. Mushroom simply gave a mailing forwarding order to the postal service. 2 N.T. at 81–82. More-

over, there is no evidence that all parties in interest ever knew of Arnold's or the debtor's Kennett Square location. (*See, e.g.,* Motion of United States trustee docketed at # 1211 and filed on December 30, 1988, seeking to convert the Robbey Realty case from chapter 11 to chapter 7. Service of the motion was sent to Robbey Realty at its former Hunting Park Avenue address.)

37. As of February 1987, the only Mushroom employees were Arnold, Robert B. Cutaiar and two part-time secretaries. 1 N.T. at 43. By the end of 1987, even those part-time employees had departed. *Id.*

38. On February 17, 1987, Ganz responded in writing to Arnold's February 12th letter. He stated that $986,000 was held by Continental in "various escrow accounts" and referred to a letter sent to Arnold by Continental counsel, Bonnie Fatell, Esquire. Ex. P–72. Ganz also informed Arnold that the personal property sale generated $70,340, of which $7,034.25 was paid to the auctioneer. *Id.* Ganz also told Arnold that "[t]he only other funds being held by our firm consist of the escrow accounts for final real estate settlements." *Id.* He then informed Arnold that the remaining issues in the chapter 11 case were administrative claims, substantive consolidation, and the sale of remaining assets. *Id.*

39. I find that the information that Ganz provided to Arnold in February 1987 regarding the amount of estate assets and the outcome of a personal property sale was probably true. Ganz did not take his first steps to embezzle estate property until some months later.

40. Before March 1987, corporate chapter 11 decisions had been made by Arnold and Robert B. Cutaiar. 2 N.T. at 70–71. After March 1987, Robert B. Cutaiar and Arnold, both employed elsewhere, did not oversee the Mushroom bankruptcy cases. Arnold testified:

Q. Where did you work from late 1987, after—did there come a time when you had full-time work other than Mushroom?

A. Yes.

Q. When was that?

A. From 1987 into 1989 at Newberry Transportation in Jersey City, New Jersey.

Q. And after that?

A. With CitiBank, working for Papercraft Corporation, and I believe that was from '89 through '91, I believe.

Q. And did you have any continuing involvement with Mushroom, Penn York, Robbey or Trux while you were in that other employment?

A. Only to the extent that I was requested to show up for hearings or there were questions about any goings-on or liquidation.

Q. And who was overseeing those activities in the bankruptcy? Who would call you?

A. Generally speaking, it would have been Jon.

Q. That'd be Jon Ganz?

A. Jon Ganz.

Q. And did he continue to be associated with the firm you knew as Pinkus, [sic] Verlin, Hahn & Reich at that point?

A. I believe so, yes.

1 N.T. at 46–47.

41. Thus, as of March 1987, Arnold was a full-time employee of a New Jersey trucking company and Robert B. Cutaiar was operating a new business from the Kennett Square location. 1 N.T. at 44, 47. From 1987 until 1991, Arnold was employed full-time either with a New Jersey or Pittsburgh entity, and, as he acknowledged, limited his involvement with the

Mushroom cases simply to responding to inquiries posed to him by others and attending to matters, such as court hearings, but only when requested by counsel. 1 N.T. at 47. (As noted earlier, whenever he did involve himself in Mushroom's affairs, he charged $300 per day.) I further find that Robert B. Cutaiar limited his involvement in the bankruptcy cases in the same manner as did Arnold, but with even less communication with Pincus attorneys such as Ganz, and without any per diem pay.

42. By 1987, communication between Mushroom and its affiliates and their counsel, the Pincus law firm, was primarily between Arnold and Ganz.

43. Ganz's oversight of the chapter 11 cases apparently included the filing of pleadings on behalf of Mushroom without the prior knowledge of Arnold or Robert B. Cutaiar. *See* 2 N.T. at 77, 87, 90–91, 93; Ex. P–201.

44. Although Arnold and Robert B. Cutaiar significantly reduced their involvement with the Mushroom cases after March 1987 and were employed elsewhere, court records reflect considerable activity in the cases after that period. For example, three adversary proceedings were commenced by the debtors in August 1988, which were later settled. There were sale requests made by the debtors (*e.g.*, docket entries # # 730, 1261, 1262), stipulations resolving disputes (*e.g.*, docket entries # # 859, 936, 937, 1252), amendments to objections (*e.g.*, docket entries # # 827, 852,877, 878), a request to engage a collection agent (docket entry # 1266), plus numerous professional fee applications were filed. To the extent that Mushroom or its affiliates were parties to these pleadings, court records reflect that they were signed by Ganz on behalf of the debtors.

45. From Arnold's testimony, it is likely that neither he nor Robert B. Cutaiar were aware of, reviewed, or authorized some or all of these submissions on behalf of the debtors after March 1987, unless a Pincus attorney affirmatively requested their involvement. As an example of the latter, in May 1987, Mushroom sought leave to sell its ICC certificates to Charlton Bros. Transportation Co. along with a temporary leasing arrangement. Docket entry # 731. The lease agreement is signed by Arnold on behalf of Mushroom and witnessed by an attorney other than Ganz, suggesting that counsel affirmatively sought Arnold's participation.

46. On June 12, 1987, this court approved a settlement between Mushroom and Continental, which settlement was also agreed to by counsel for the official creditors committee and by counsel for the Estate of Robert Cutaiar. Exs. P–86, 87. This agreement, signed by Ganz as counsel to the debtors, provided for the repayment in full of Continental's secured claim. The agreement also stated:

> On payment to [Continental] Bank of the balance of the Debt, the remaining Escrow Funds shall be turned over to Debtor's counsel, Pincus, Verlin, Hahn & Reich, P.C. to be held in escrow for the benefit of the Debtor's [sic] estate, subject to certain limitations described more fully below. The Syracuse Proceeds shall be remitted to Pincus, Verlin, Hahn & Reich to be deposited into the escrow account.

Ex. P–86, ¶ 4.[6] Arnold was not aware of this settlement or its terms when it was entered into by Ganz. Nor is it likely that attorneys at Pincus, other than Ganz, knew of this agreement, for no one at the firm was monitoring or supervising Ganz's ac-

---

6. The limitations referred to in paragraph 5 of the settlement permitted Continental Bank to retain funds to secure two letters of credit that were then outstanding. The Syracuse proceeds refer to the sale of the Syracuse terminal.

tivities. Furthermore, Arnold's and Robert B. Cutaiar's decision to reduce their involvement in the Mushroom bankruptcy cases predated this settlement and was unconnected to its terms.

47. On June 16, 1987, Ganz wrote to counsel for Continental that the funds due Mushroom under the stipulation should be "made payable to me as counsel for the Debtor so that I may place it in a certificate of deposit." Ex. P–88. This letter was only sent to the attorney for Continental and was the first step Ganz took toward misappropriating Mushroom funds.

48. As of June 30, 1987, the Mushroom escrow account maintained by Continental held $1,038,176.82. Ex. P–90. This account commingled funds belonging to Mushroom as well as its affiliate debtors.

49. On July 21, 1987, Continental's counsel informed Ganz that Continental's secured claim had then been repaid in full and that arrangements should be made about disposition of the balance due Mushroom. Ex. P–96.

50. As of July 31, 1987, Continental's Mushroom escrow account held $766,624.49, with $200,000 having been withdrawn on July 21, 1987. That withdrawal was payable to Ganz as "council" for Mushroom. Exs. P–97, P–98.

51. The $200,000 was deposited by Ganz into a personal bank account titled in his name at Fidelity Bank. Ex. P–179 at 3527. Ganz acknowledged that this was his first misappropriation of Mushroom funds. Ex. P–182 at 77–78. He had not misappropriated any of the deposits given to the Pincus firm on behalf of realty buyers, nor any of the sale proceeds when the realty sales occurred. *Id.* at 72–73. After these $200,000 in funds were deposited into his own account at Fidelity, Ganz did not immediately spend them. "It was commingled with other funds which were not all personal funds. I believe the $200,000 was there for quite some time[.]"

*Id.,* at 83. In fact, there remained more than $350,000 in that account until October 1987.

52. I find it more likely than not that after Ganz deposited these funds into his personal bank account in July 1987, he waited for months to determine if anyone connected with the Mushroom case would question his actions. If a challenge arose, he could restore the funds quickly into a Pincus escrow account and feign inadvertence. However, when months passed with no inquiries about the Continental funds from any quarter, Ganz felt safe and began to withdraw those funds and use them for his own purposes.

53. Prior to Ganz's first misappropriation, the Pincus firm had opened its own escrow account for Mushroom. Access to the law firm's escrow accounts involved notifying the firm's bookkeeper in order to make deposits and withdrawals. Ex. P–182, at 24–25; 49–50; 2 N.T. at 192–93. The firm bookkeeper made deposits into the firm escrow accounts and kept the records for those accounts; withdrawals required an attorney to fill out a withdrawal request form. Ex. P–182 at 155–56; 2 N.T. at 193, 204. If the bookkeeper was dissatisfied with a withdrawal request, she would communicate with the most senior shareholders of the firm. 2 N.T. at 193.

54. The firm's escrow accounts were examined and audited in 1988 or 1989, with no discrepancies found in the escrow accounts except a minor one, not involving Mushroom. Ex. P–182 at 161–62, 218.

55. Ganz was not familiar with whatever internal law firm controls existed as to its escrow accounts. Ex. P–182 at 219–220. That is, he did not know whether there were internal controls.

56. Not all Mushroom funds that Continental held after the June 1987 stipulation were placed into Ganz's personal bank

account at Fidelity Bank. Some funds were probably deposited into the law firm escrow account. Ex. P–182 at 25. For example, under the terms of the June 1987 stipulation, Ex. P–86, ¶ 6, Continental Bank was authorized to retain $65,000 as collateral for an outstanding letter of credit issued on behalf of Mushroom. On March 16, 1989, it released those funds to Mushroom by a check sent to Ganz. Ex. P–145. The Fidelity bank account reconstruction performed by the United States trustee, Ex. P–179 at 3601–02, does not reflect any deposit in that amount at that time. Thus, it is likely that this $65,000 was deposited into the law firm account. *See also* Ex. P–91 (a stipulation resolving a letter of credit in which Mushroom would receive $32,500; this stipulation is not signed by Ganz and it is likely that these funds were not transferred to Ganz's personal account).

57. In July 1988, $199,508.78 was deposited into an escrow account held by the Pincus firm. Ex. P–132. Of this sum, $109,508.78 was derived from a Fidelity Bank check made payable to Ganz as agent for Mushroom. *Id.* On January 8, 1989, a withdrawal in favor of the Pincus firm was authorized by Ganz in the amount of $55,375.30, with the notation of "Mushroom . . . fees & costs." Ex. P–141.

58. I find it likely that Ganz did not risk using the Pincus law firm escrow account for his misappropriation of Mushroom funds. The initial deposit of Mushroom funds from Continental into a Fidelity account supports this. If he could divert the funds directly into his own personal account, it would lessen his risk of exposure. Thus, the United States trustee audit was able to trace his misappropriation of Mushroom funds solely to bank accounts titled in his

name. Accordingly, I find there is no proof that he embezzled Mushroom funds using the Pincus escrow accounts. Rather, he misappropriated estate property by diverting Mushroom funds held by Continental Bank into his own accounts.

59. The Continental escrow account for Mushroom was closed on August 3, 1987. Just prior to closing, it held $766,624.49. Ex. P–99. On that same day, a new account was opened at Continental, "in the name of Mushroom Transportation Co., Inc. by Jonathan H. Ganz, Escrow Agent, with an opening deposit of $766,624.49." Ex. P–102. The address on this new bank account was Ganz's address at the Pincus firm. Ex. P–103. Thus, Continental did not transfer the funds directly to the Pincus firm, nor were those funds deposited in an established Pincus escrow account.

60. Beginning on November 20, 1985, Mushroom and some affiliates sporadically filed monthly operating statements. The last report was filed on June 23, 1987. (No operating reports were filed for May, June or July, 1986, or for January 1987.) Penn York filed a series of monthly statements on February 11, 1987 covering the period through October 1986. Ex. P–200 (docket entries # # 696–711). These monthly operating statements were signed by Robert B. Cutaiar, Treasurer.[7]

61. On these sporadically filed statements, neither Mushroom nor its affiliates listed bank balances; nor do these reports disclose funds held in escrow. Mushroom's pre–1987 reports do reveal payments to "secured creditors," but no such secured creditor payments are revealed in any 1987 operating reports. Therefore even had operating reports been filed by all the debtors for each month, one could estimate the total sum paid to Continental

---

7. These reports are part of the court record and I take judicial notice of their contents, but not for the truth of their averments.

only if it were the sole secured creditor. One could not, however, compute the amount of Continental's remaining debt, nor could one determine the amount of sums held in escrow by Pincus or Continental.

62. The operating report for April 27, 1987 to May 29, 1987, filed on June 23, 1987 (docket # 752) revealed receipts of $9,065.36 and disbursements of $15,447.75, of which $12,210 was identified as "management fees." [8]

63. On August 28, 1987, Ganz on behalf of Mushroom filed a motion to excuse the filing of further operating reports. That motion was granted on September 3, 1987. Ex. P–200 (docket entry # 780). There was no evidence to explain the reason that Robert B. Cutaiar ceased filing operating reports for Mushroom after June 23, 1987, months before court approval was sought or leave to do so was granted.

64. Given the paucity of information in those reports, as well as their sporadic nature, I find that their cessation did not help Ganz to misappropriate Mushroom funds, nor were they part of his plan to do so. (Indeed, his misappropriations began earlier.) Had Mushroom or its affiliates continued to file similar reports each month, those reports would have provided no evidence of Ganz's embezzlement.

65. Arnold first learned of Mushroom's request to cease filing operating reports only at some unspecified time after it had been granted. 2 N.T. at 123–24. Since Robert Cutaiar had ceased preparing reports before Ganz made any cessation request, and never filed any reports thereafter, it is probable that he knew of Ganz's filing before it occurred, and may have proposed it.

66. On August 31, 1987, the amount in the Continental Bank account titled in the name of Ganz, as Escrow Agent, was $769,550.59. Ex. P–103. As of September 30, 1987, this account held a balance of $773,024.92. P–107.

67. Beginning in October 1987, Ganz began to make withdrawals from this Continental account. By March 31, 1988, the account was reduced to $169,940.07. Exs. P–107, P–111, P–112, 114. On April 13, 1988, the remaining sums were withdrawn by Ganz and the account was closed. Ex. P–179 at 3527. All of the withdrawn funds from this Continental bank account were deposited into Ganz's personal bank account at Fidelity Bank. Id. However, the United States trustee's audit team concluded that $196,894.46 of the Continental funds were used by Ganz to pay for "court approved professional fees in the Mushroom ... bankruptcy case." Ex. P–179 at 3526. Thus, the audit team could verify only that $569,940.07 was misappropriated by Ganz and used for his own purposes. Id.

68. Continental issued a 1099 annual tax statement for interest earned for 1987 on the escrow account in the amount of $28,396.48, and sent this statement to Ganz at his Pincus address on January 21, 1988. Ex. P–115. It is likely that Fidelity Bank and other banks in which Ganz held personal accounts also sent him 1099 annual tax statements. It is unlikely that the Pincus firm or Arnold or Robert B. Cutaiar were aware of these accounts or the interest statements issued.

69. On February 2, 1988, Ganz wrote a brief note to Arnold enclosing a copy of the June 1987 stipulation involving Mushroom and Continental, which had been approved nine months earlier. Ex. P–201. The letter ends with the sentence, "Hope this clarifies the matter." It is likely that

---

**8.** Management fees in the same amount are disclosed in the April 1987 report, but in no others. There was no evidence to explain the nature, purpose or validity of these fees.

Arnold, due to a query from creditor committee counsel, had in some manner communicated with Ganz, either about the Mushroom escrow account at Continental or about the Mushroom case in general, and Ganz was responding. Arnold first learned of the June 1987 Continental stipulation and its terms when he received this February 1988 letter from Ganz. 1 N.T. at 139–40; 2 N.T. at 91.

70. Arnold's testimony that he first learned of the June 1987 stipulation in February 1988 is more credible than Ganz's supposition that he "probably" sent Arnold a copy of the June 1987 stipulation directly after it was approved by the court. Ex. P–182 at 104–05. Indeed, Arnold's recollection is supported by Ganz's February 1988 letter and Arnold's reply letter in February 1988. Moreover, Arnold's lack of knowledge is consistent with his being employed full-time in New Jersey and his learning only what Ganz felt compelled to tell him.

71. Between Ganz's letter to Arnold of February 17, 1987, and Ganz's letter of February 2, 1988, there does not appear to be any other written communication between Ganz and Arnold.

72. On February 10, 1988, Arnold responded to Ganz's February 2nd letter requesting additional information, but did not complain or question any provision of the 1987 settlement agreement with Continental. Since the June 1987 settlement agreement did not specify the amount Continental was to turn over to the Pincus firm, or even specify the date of the turnover, Arnold wrote to Ganz, in part:

> Your February 2nd letter clarifies the matter of funds being held by Continental Bank to the extent that there were some funds being held in escrow by the bank pending a [substantive] consolidation determination but does not clear up the problem of how much is being held and by whom.

Ex. P–202. In this February 10th letter, Arnold also provided his own estimates of the amount originally owed to Continental by Mushroom, the amount paid to Continental from Mushroom's post-bankruptcy operations, and the amounts obtained by Continental from the liquidation of various affiliate realty assets, with some handwritten figures added by Robert B. Cutaiar. 1 N.T. at 140–41; 2 N.T. at 39. Arnold concluded his letter to Ganz with the following:

> The net result before any payouts would appear to be somewhere in the area of $1,400,000.00 that was in the possession of Continental Bank or Pincus, Verlin, Hahn and Reich.

> Since Paul Silverstein [counsel to the official creditors committee] has also been asking me for an accounting, please review the enclosure for [its] accuracy before I offer Paul a copy.

> If you have any questions or problems please advise.

Ex. P–202.

73. Unlike Arnold's February 1987 letter, which triggered a written, detailed reply from Ganz, Ganz did not respond in writing to Arnold's February 1988 letter. 2 N.T. at 40. Arnold testified that Ganz told him by telephone that he (Ganz) was holding about $1 million, 2 N.T. at 40, that the assets were invested in certificates of deposit, and that Arnold's estimates in his February 1988 letter were substantially correct. 1 N.T. at 45; 2 N.T. at 39–40. Ganz testified in a deposition that he held a conversation with Arnold at some point after receiving the February 10, 1988 letter but recalled their conversation somewhat differently. He told Arnold "[t]hat whatever money was there was there, and there was probably less than what was originally turned over because of legal fees and that type of thing." Ex. P–182 at 54. Ganz further testified that Arnold did not

request signature authority on any of the accounts, nor request that he (Arnold) be added to the accounts, nor ask in whose name the accounts were in, nor seek information about the location of the accounts. *Id.*

74. On direct examination at trial, Arnold's testimony left the impression that Ganz promptly responded to Arnold's February 1988 letter with a telephone call. 1 N.T. at 45. I find that impression is inaccurate. When this conversation regarding Arnold's February 1988 query about the Mushroom assets occurred is not completely clear, other than Arnold acknowledged on cross-examination that he had previously stated in a pre-trial deposition that he was only certain that Ganz's reply to his February 10, 1988 letter occurred before 1990. 2 N.T. at 40–41. Ganz acknowledged in a pre-trial deposition held in 1994 of having had periodic telephone conversations with Arnold about the funds purportedly held by Pincus in escrow, but testified that he could not recall such conversations taking place in February 1988. He testified:

Q. From the date that Judge Fox signed the order in 1987 authorizing the liquidation and Continental Bank paying itself and then turning the money over to Pincus until you voluntarily terminated your relationship with Rawle and Henderson [in 1992]—
Ganz: Yes.

Q.—did Michael Arnold, or anyone from Mushroom Transportation Company, ask you what happened to the Continental money, or anything of that nature?
Ganz: I was asked how much money was left in our possession, quote, unquote.[9]

Q. When was that?
Ganz: I couldn't give you exactly the times. There were periodic conversations with Mr. Arnold when we were trying to determine who was good [sic] going to get paid what, if there was a plan confirmed, a liquidating plan confirmed.

Q. Well, with respect to when you got the first $200,000 from Continental Bank [July 1987], can you give us a date as to when Arnold asked you how much was left over?
Ganz: I would say not for several years. We didn't really get into the conversation until maybe '89 or '90 when we were starting to—trying to get a [chapter 11] plan confirmed.
That's a guess, but it wasn't in '87 [sic [10]], I don't believe.

Ex. P–182 at 52–53.

75. Arnold ultimately conceded at trial that he could not recall providing any accounting of the Mushroom funds to the creditors' committee counsel in 1988. 2 N.T. at 43.[11]

---

9. That statement would refer to the February 10, 1988 letter sent by Arnold.

10. Ganz probably meant "1988."

11. Again, Arnold's trial testimony on this point evolved. Initially, he was asked to whom did he "transmit that information" from Ganz about the funds purportedly held by Pincus. 1 N.T. at 45. His reply—"I believe the request came from Paul Silverstein, who was one of the counsel for the Creditors' Committee," *id.* at 45—does not answer whether Arnold ever replied to Mr. Silver-

stein. Later, he testified that at "some point in time" Ganz responded to his February 1988 letter and he "pass[ed] on Ganz's information to Mr. Silverstein." 1 N.T. at 141. And on cross-examination, he stated that he could not recall providing committee counsel with an accounting. 2 N.T. at 43.

I conclude that his concession on cross-examination that he did not recall providing Mr. Silverstein with the accounting the latter requested is more credible, especially as it is likely that Ganz did not provide any oral response to the February 1988 letter before the latter part of 1988 at the earliest.

76. Mushroom filed a proposed liquidating chapter 11 plan in April 1990. Ex. P–200 (docket # 1314). In November 1988 and December 1989, however, there were hearings on the allowance of numerous proofs of claims. *Id.* (docket entries # # 1009–1091, 1096–1164). It is likely that Arnold and Ganz communicated in preparation for those claims hearings, as Ganz would have requested Arnold's participation.

77. Given Arnold's testimony of his limited involvement in Mushroom affairs after March 1987, and given the imprecise evidence regarding the date of Arnold's discussions with Ganz about the Mushroom funds purportedly held by Pincus under the June 1987 settlement, it is likely that Ganz's oral communication to Arnold regarding funds supposedly held by Pincus in escrow occurred many months after Arnold sent his February 10, 1988 letter requesting information from Ganz, and probably no earlier than November 1988, when the claims hearings first took place, and possibly later. Unless creditor committee counsel were persistent in seeking information from Arnold, and there was no evidence of such persistence, Arnold would not seek information from Ganz.

78. Arnold concedes that at no time did he ever ask Ganz for the identity of the institutions issuing the certificates of deposits, nor interest rates, nor the amounts of the certificates. 2 N.T. at 42. Nor did Arnold request that copies of 1099 interest statements be sent to him or reviewed by him. 2 N.T. at 45. In fact, he never sought copies of any bank statements from Ganz. All this is consistent with Arnold's acknowledgment that he limited his role in responding to inquiries and involving himself in Mushroom issues only as requested by counsel.

79. Arnold testified that whenever he ultimately heard from Ganz in reply to his February 1988 letter seeking information about the funds Pincus purportedly held, he had no reason to disbelieve Ganz's oral response. 1 N.T. at 46, 141. I find that there was never any "smoking gun" revealing Ganz's criminal activities until February 1992. There were, however, indicia prior to that time that could cause Arnold to question whether the June 1987 stipulation was complied with.

80. By early 1987, all of the Mushroom and affiliate entity officers, except Arnold and Robert B. Cutaiar, had ceased all involvement in the chapter 11 bankruptcy cases. Arnold's willingness to have some continuing, albeit limited, involvement with the Mushroom bankruptcy cases after he became a full-time employee of a New Jersey corporation was likely due to a combination of factors. He, as corporate counsel, had recommended the bankruptcy filing; he had some personal connection to Ganz; he was related to some of the Cutaiars and his father had been a long-time employee of Mushroom, 2 N.T. at 64; he was receiving some compensation for his limited involvement; and he and other corporate officers might have had responsible party federal trust fund tax liability arising from Mushroom's operations. 1 N.T. at 41, 45.[12] He would not, however, earn sufficient income as liquidating consultant. Nor could Arnold expect any dividend from the Mushroom cases. Thus, Arnold felt the need to obtain other employment and thus restrict his role in the chapter 11 proceedings as mentioned above.

---

12. Although Arnold testified that "the president, Richard Quetare [sic] and one of the Vice Presidents, Robert Quetare [sic], in front of the IRS accepted full responsibility for not paying those funds," 1 N.T. at 41, it appears that the IRS was compelled to bring suit in 1991 against Robert W. Cutaiar (father of Robert B. Cutaiar), Mushroom's president. *See Cutaiar v. United States,* 1992 WL 198927 (E.D.Pa.1992).

81. In August 1988, I issued an order upon the contested motion of pension fund creditors that all of the debtor companies would be considered under common control and thus were a common employer for purposes of pension fund withdrawal liability. *See In re Mushroom Transp. Co.*, 90 B.R. 718 (Bankr.E.D.Pa.1988). This adjudication had the effect of undermining the objections of various Cutaiar family members to substantive consolidation, leaving but a few objections to resolve, and virtually assuring that Cutaiar shareholders would not receive any dividend from the Mushroom liquidation. Nevertheless, no party, including Mushroom through Arnold, ever requested a hearing to resolve those remaining objections to substantive consolidation. 2 N.T. at 84–85.

82. I find it likely that Ganz did not advise Arnold to seek a hearing on substantive consolidation after the August 1988 ruling, due to Ganz's illegal activities. The longer the case dragged on, the less likely he would be held to account. As for Mushroom, both Arnold and Robert B. Cutaiar were employed full-time elsewhere, and Arnold, as noted earlier, essentially was taking no action in the case unless requested by Ganz. In addition, Arnold was receiving $300 per day for any work he performed as liquidating consultant. Thus, on the Mushroom side, given the actors and their interests, the failure to seek a prompt resolution to these chapter 11 cases is unsurprising. There was no evidence to explain the inaction of creditors, including the official creditors' committee.

83. As of September 1988, Arnold knew that Continental Bank had been completely repaid. He further knew that since October 1986 he had not received any bank statements concerning escrowed funds belonging to Mushroom and its affiliates. As of September 1988, Arnold probably had not received even an oral reply from Ganz in response to his February 1988 letter, in contrast to Ganz's prompt written response in February 1987. Arnold also knew at this time that the creditors' committee had sought an accounting from him, but did not receive the information sought. As of this date, Arnold was aware that Ganz was acting without client direction in that he was filing pleadings and entering into settlements which Arnold never authorized. And he was also aware that the August 1988 ruling on common control for withdrawal liability effectively weakened Cutaiar opposition to substantive consolidation, and yet no adjudication of this outstanding motion had been sought. Arnold also knew that no tax returns for the debtor corporations had been filed and no postpetition interest information was being provided. And as of September 1988, Arnold was still being compensated on a per diem basis, albeit without court authorization, as special liquidating consultant whose purpose was to oversee the collection of Mushroom assets.

84. In February 1989, counsel for a pension fund creditor (Kent Cprek, Esq., who is now the trustee's attorney in this proceeding) sent a letter to a Pincus employee requesting information regarding the assets and liabilities of the case. A copy of this letter was sent to Ganz. Ex. P–143. There is no evidence that a reply was sent or that Arnold knew of this inquiry.

85. On July 6, 1989, Cprek sent another letter to Ganz and other Pincus attorneys requesting a meeting to discuss the case. Ex. P–147. A copy of this letter was purportedly sent to Arnold and others. Clearly this counsel knew of Arnold's correct address by 1990. 1 N.T. at 145. Thus, it is possible that counsel had Arnold's proper address in July 1989.

86. Cprek sent a third letter on July 10, 1989, addressed to Ganz and referring to a conversation on July 7, 1989, probably in connection with his July 6, 1989 letter. The July 10th correspondence states that "within about 10 days" Ganz will "be able to discuss the actual allocation of assets and liabilities" involved in the repayment of Continental's claim. Ex. P–149. A copy of this letter was purportedly sent to Arnold, among others. There was no evidence that Ganz ever supplied the promised information. Nor was there any evidence that Arnold took any action or sought information in connection with this letter.

87. When Mushroom and its affiliate corporations filed bankruptcy petitions in July 1985, their bankruptcy counsel was known as Pincus, Verlin, Hahn & Reich, P.C. This firm acknowledges using the "trade name" of Pincus, Verlin, Bluestein, Hahn & Reich, P.C. from July 1987 until approximately February 1988. Defendants' Answer to Plaintiff's Amended Complaint, ¶¶ 9–10. *See also* Ex. P–131. On July 10, 1989, the law firm of Pincus, Verlin, Hahn & Reich, P.C. officially changed its name to Pincus, Reich, Hahn, Dubroff & Ganz, P.C. as a successor corporation. Ex. P–148; Defendant's Answer, ¶ 9.

88. On July 28, 1989, the firm of Pincus, Verlin, Hahn & Reich, P.C., known then by its new name, through approval of its directors and shareholders, decided to cease operating and to distribute its corporate assets. Ex. P–150. There is no evidence, however, that this corporation legally dissolved pursuant to Pennsylvania law. 2 N.T. at 176; Ex. P–212.

89. Upon cessation of operations, every client file of Pincus, Verlin, Hahn & Reich, P.C. was assigned to its originating attorney and that attorney also obtained control of the funds, if any, existing in that client's escrow account. 2 N.T. at 63; Ex. P–182 at 179–80, 202. There was no evidence that Pincus' clients were informed about the disposition of client escrow accounts.

90. A bank statement dated August 31, 1989, from Provident Bank reflects that there was $2,365 in a Pincus escrow account for Mushroom. A Provident bank statement dated December 12, 1989 shows only $1,165.91 in this account. Ex. P–157.

91. The firm of Pincus, Reich, Hahn, Dubroff & Ganz operated for about three to four months in 1989, and then merged in late 1989 with the law firm of Astor, Weiss & Newman. Ex. P–182 at 176, 182, 183–84. Ganz became a partner at Astor, Weiss & Newman. *Id.* at 45–46.[13]

92. On January 16, 1990, Mushroom sought the appointment of substitute counsel, Astor, Weiss & Newman, because Ganz had become a member of that firm. Ex. P–200 (docket entry # 1310). The application was approved retroactive to December 18, 1989. Ex. P–200 (docket entry # 1311).[14] I find it probable that Arnold knew of Ganz's move to Astor, Weiss & Newman when it occurred. Nonetheless, there is no evidence that the engagement of a new law firm precipitated Arnold's inquiry of Ganz concerning the location of the Mushroom funds purported-

---

**13.** Ganz acknowledged embezzling about $76,000 of Mushroom funds while at Astor Weiss and the trustee sued that partnership firm as a defendant in this adversary proceeding. Those claims have been resolved.

**14.** I take judicial notice of this application and the order approving it, both of which are on file with this court. Moreover, the existence of these documents are noted on the court docket, which docket the plaintiff offered in evidence. Thus, I find both puzzling and unpersuasive the trustee's proposed legal conclusions # # 124–25, and surrounding arguments, that there was no court-approved substitution of debtor counsel when Ganz left the Pincus firm for Astor, Weiss & Newman.

ly held by the former Pincus law firm under the terms of the Continental stipulation. Similarly, in 1991, Ganz joined the law firm of Rawle and Henderson. Ex. P–182 at 189. Again, Arnold probably knew of this move, but it did not trigger any inquiry on his part about the Mushroom assets.

93. In November 1989, the United States trustee filed a motion to convert or dismiss the Mushroom and affiliate chapter 11 cases. Ex. P–200 (docket entry # 1296). This motion resulted in an April 13, 1990 deadline for parties in interest to file a chapter 11 plan and disclosure statement. *Id.* (docket entry # 1307).[15] The debtors then filed a consolidated, liquidating chapter 11 plan, accompanied by a disclosure statement on April 12, 1990. Ex. P–200 (docket entries # # 1314–15). These documents are in the court file and are signed by Arnold on behalf of the debtors.

94. I find it likely that the debtors' proposed plan was filed only because of the pressure being placed by the United States trustee, pressure of which Arnold would have been aware through Ganz.

95. Although the disclosure statement asserted that the debtors possessed $1.6 million for distribution under the proposed plan, Disclosure Statement at 13, the disclosure statement contains no corroboration of this sum.

96. Also on April 12, 1990, the Philadelphia Teamsters Pension Fund filed its own proposed chapter 11 plan and disclosure statement. Ex. P–200 (docket entries # # 1316–17).[16]

97. In May 1990, Mushroom proposed a chapter 11 plan jointly with the pension fund creditor, but confirmation of that plan was denied. Ex. P–200 (docket entry 12/1/90). On December 12, 1990, the Mushroom chapter 11 case was converted to chapter 7. No conversion was ordered for the affiliated companies. Ex. P–161. However, they were effectively converted when later consolidated with the Mushroom case.

98. Christine Shubert, Esquire was appointed the interim chapter 7 trustee. Ex. P–200 (docket entry # 1367). Ganz and Cprek, counsel to the pension fund creditors, then approached Arnold to become the chapter 7 trustee and arranged for Arnold's election under 11 U.S.C. § 702. 2 N.T. at 52, 60. On or about February 26, 1991, Arnold was elected Mushroom's chapter 7 trustee. 2 N.T. at 48. Ex. P–200 (docket entry # 1371).

99. I find it likely that Ganz was in favor of Arnold becoming Mushroom's chapter 7 trustee because he believed Arnold would be less likely to discover or reveal his misappropriations. Pension fund counsel was probably acting under the (mistaken) belief that Arnold as trustee would efficiently administer the chapter 7 estate.

100. After he was elected trustee, Arnold was provided by the office of the United States trustee with a handbook intended to aid all chapter 7 trustees in the performance of their duties, which handbook he reviewed. 2 N.T. at 48, 50. The handbook explained the duty of the trustee to obtain possession of estate property. 2 N.T. at 52–53.

---

15. By this time, the chapter 11 debtors' exclusivity period under section 1121 had long expired.

16. These documents, also in the court file, contain the uncorroborated representation of the creditor in its disclosure statement that the debtors had $600,000 in various bank accounts and Astor, Weiss & Newman held $800,000 in escrow. Pension Fund Disclosure Statement, at 8. There was no evidence to explain the source of this information.

101. Although elected chapter 7 trustee in February 1991, Arnold did not engage trustee counsel, nor did he seek to obtain possession of any Mushroom estate property from the Pincus firm, the Astor firm, or from Ganz until after he learned of Ganz's criminal activities from the United States trustee in February 1992. 2 N.T. at 48, 53. Not until July 1992 did he seek to engage counsel. 2 N.T. at 59; P–200 (docket entry # 1383). However, he was likely aware that neither Ganz nor Ganz's law firm represented him when he became chapter 7 trustee. 2 N.T. at 51.[17]

102. Exhibits P–160 and 166, dated November 19, 1990 and May 20, 1991 respectively, are letters Ganz's office at Astor, Weiss & Newman sent to Cprek representing continuing efforts at settling the substantive consolidation dispute. The first letter, signed by Ganz's secretary, stated that "We have available from our side $614,000 plus or minus." Ex. P–160. In the second, Ganz wrote that there was "approximately $1,100,000 in the estate." Ex. P–166. No one was sent copies of these letters.[18]

103. The first of these letters was written just before the Mushroom case was converted to chapter 7. The second was written six months after conversion to chapter 7, with Arnold serving as bankruptcy trustee. In May 1991, Ganz and his firm did not represent the chapter 7 trustee and had no authority to enter into any agreements on behalf of the trustee or Mushroom, the debtor. Yet Ganz was acting as if he still were representing Mushroom and Arnold. I find it likely that Arnold, who should have known differently, was content to allow Ganz to do so.

104. In September 1991, the Teamsters Pension Fund of Philadelphia and Vicinity moved for court approval of a settlement agreement regarding substantive consolidation and/or marshaling of assets. Ex. P–167. The settlement agreement was signed by Robert B. Cutaiar on behalf of Penn York, Robbey Realty, and Trux. It was signed by Arnold as trustee for Mushroom. On January 6, 1992, this settlement motion was approved after all objections were withdrawn. P–200 (docket entry # 1376). Arnold still did not ask Ganz (or the former Pincus or Astor firms) to turn over estate assets, even though the substantive consolidation issue was finally resolved.[19]

17. Given my legal conclusion that the trustee has proven that the Pincus firms, acting through their agent Ganz, entered into a June 1987 contract to hold Mushroom funds in escrow, and as there was a four-year limitations period for breach of this agreement, Arnold's election as chapter 7 trustee was well within the limitations period.

18. There is no evidence that Arnold knew of the content of these letters. In hindsight, given the April 1990 representation in their disclosure statement that the debtors had $1.6 million to distribute, counsel for the pension fund may have wondered about the lower figures in these letters.

19. Arnold testified that after the order was entered approving substantive consolidation, he requested that Ganz turn over funds to him. 1 N.T. at 148. Technically, that testimony is true but imprecise. Arnold also testified that he made this request of Ganz only after being pressed about Mushroom's assets by the United States trustee in February 1992. 1 N.T. at 58; 2 N.T. at 48. He acknowledged that his request to Ganz for turnover was "roughly contemporaneous" with the disclosure of Ganz's conduct by the United States trustee. 2 N.T. at 118.

I find it likely that Arnold, who had taken no action regarding estate property for more than one year after he became chapter 7 trustee, would take no action against Ganz unless pressured to do so by someone such as the United States trustee. Thus, court approval of substantive consolidation in early January 1992, by itself, did not trigger turnover action by him.

105. In February 1992, the United States Trustee for Region 3 informed Arnold that Ganz was suspected of having embezzled funds from numerous bankruptcy estates, including Mushroom's. 1 N.T. at 59–60. Only then did Arnold make demand for the turnover of estate assets. 2 N.T. at 48.

106. On October 5, 1992, Arnold commenced the present adversary proceeding against the Pincus firms, and others (including Ganz). Arnold was later removed as chapter 7 trustee for cause (embezzlement, 2 N.T. at 57) and Jeoffrey L. Burtch became successor trustee and plaintiff.

107. Although Arnold testified that he communicated with Ganz "numerous times" about the Mushroom assets, beginning in 1987, 1 N.T. at 57, such testimony to the extent it implies that Arnold was attentive to or interested in the protection of Mushroom assets for the benefit of its creditors is not credible. There is no written communication after February 1988. Arnold was working full-time for a New Jersey firm and later for a Pittsburgh company beginning in 1987. He never sought any bank account or interest statements, or other corroborative or relevant tax information. Although Ganz provided a written reply to Arnold's accounting request in February 1987, he did not do so with a similar request in February 1988, and Arnold did not press him for information. Arnold expressed no concern about the assets after Ganz joined another firm. And even after he became trustee in February 1991, and was not represented by the Pincus firm, and after he received information from the United States trustee about his duty to obtain control of estate property, he never sought any information or attempted to collect the assets from Ganz or Pincus. He attempted no recovery after the substantive consolidation order was entered. And, as trustee, he also embezzled estate property.

108. The United States Trustee for Region 3 investigated Ganz's activities and prepared a report used to criminally prosecute him. This report reflects that Ganz stole at least $2,337,892.48 from 19 different bankruptcy estates, including the Mushroom and affiliate estates. Ex. P–179 at 3328, 3526.

109. The United States trustee determined that at least $569,940.07 in Mushroom and affiliate funds were embezzled by Ganz. Of the roughly $966,000 turned over by Continental after its secured claim had been repaid, about $197,000 was properly used to pay administrative expenses owed to professionals. About $200,000 was used to purchase a certificate of deposit at Liberty Bank but no records were available to demonstrate the disposition of these funds to the audit team. Ex. P–179 at 3526.

110. Ganz testified during a deposition held in 1994 that he withdrew the funds on deposit with Liberty and placed them in a Provident Bank account titled "Estate of Mushroom Transportation, Debtor in Possession." Ex. P–182 at 41–42. This account was an escrow account for Mushroom and was used to pay certain Mushroom expenses, including payments to Arnold beginning in February 1989. Ex. P–182 at 41–44, 62–63.

111. There was no evidence concerning the full disposition of the funds in this account:

Another $200,000.00 was invested in a certificate of deposit at the Liberty Bank which matured on February 7, 1989 in the amount of $214,701.87. The proceeds from the certificate were deposited into another bank account entitled Mushroom Transportation—Debtor in Possession at the Provident Bank. The records of this account were not received at the time of this report and,

therefore, these funds could not be verified as being misappropriated. Ex. P–179 at 3526.[20]

112. However, Ganz does acknowledge that after 1990, and while employed at Astor Weiss & Newman, he misappropriated $76,311 from funds derived from the Liberty Bank account. Ex. P–182 at 118–119. (As aforesaid, the trustee resolved his dispute with Astor Weiss over this misappropriation.) He also insisted that in 1994 there should have been approximately $60,000 in the name of Trux on deposit at Liberty Bank, with statements sent to him at Astor Weiss, based upon an initial $40,000 deposit. *Id.* at 151, 182, 208–11.

113. Prior to February 22, 1994, Ganz pled guilty to taking $781,000 from Mushroom. Ex. P–182 at 207. In so pleading, Ganz testified that he did not bother to verify this allegation because he did not believe it would affect his sentence. Ex. P–182 at 138:

> Q. Still going back to the [criminal] information, when it talks about taking of $781,000—I believe that's the number?
>
> Ganz: Well, it—based on everything they showed me, we went over it. That's an approximate number.
>
> We never really went to refine it because we were told that even if there was a 100,000 less or more, it wouldn't change the sentencing guidelines. So we never bothered to do anything about it.

114. Adding the $76,311 embezzled by Ganz while at Astor Weiss to the $569,940.07 embezzled by Ganz using the Fidelity account, yields $646,251.07 in stolen Mushroom funds. Adding the $40,000

that was outstanding in the Liberty account in 1994 totals $686,251.07.

II.

I reach the following legal conclusions in this proceeding against the Pincus law firms:

1. The trustee has not proven that the Pincus law firms possessed estate property that it refused to turn over to the trustee or was otherwise dissipated.

2. The trustee has proven that the three Pincus law firm defendants acted as successors to the Pincus firm engaged to represent the chapter 11 debtors.

3. The trustee proved that the Pincus law firms violated their fiduciary duty to the chapter 11 debtors when their agent, Jonathan Ganz, embezzled estate funds.

4. The trustee proved that the Pincus law firms breached an agreement entered into by their agent, Jonathan Ganz, to place estate funds into escrow.

5. The trustee proved damages caused by this breach of agreement in the amount of $686,251.07, plus pre-judgment interest of $551,196.65.

6. The trustee's lawsuit against the Pincus firms was commenced after the relevant statutes of limitations periods had expired.

7. The trustee did not establish that his predecessors in interest acted with due diligence to discover these proven breaches and therefore he is not entitled to toll the limitations periods. Prior to October 5, 1988 (four years before suit was commenced), Arnold as representative of the debtors in possession had enough indicia that a prudent person in Arnold's position

---

**20.** Ganz conceded that he paid himself $17,245.45 from the Provident account in February 1989. Ex. P–182 at 89–90. However, this sum appears to be payment of a fee award made to the Pincus firm. *Id.* Thus, this payment, though improper, likely harmed the law firm rather than the Mushroom estate.

would have sought corroboration that the estate assets were safe and in so doing would have discovered Ganz's misappropriation.

### III.

As I observed at the outset, the plaintiff/trustee has asserted three claims against the Pincus law firms.

First, in Count I ("Turnover"), he asserts that Pincus has "failed to turn over and account for proceeds from the sale of assets of Mushroom, Robbey, Penn York and Trux delivered to them or persons under their supervision or control by Continental in accordance with 11 U.S.C. §§ 542, 543." Amended Complaint, ¶ 28. The Pincus defendants deny receiving any Continental funds and deny having any in their possession when this lawsuit was commenced in October 1992. Answer, ¶¶ 25–28.

Second, in Count II ("Breach of Duty"), he avers that "[a]s part of their representation of Mushroom, Robbey, Penn York and Trux, [Pincus] received proceeds from the sale of the assets of the bankruptcy estates of Mushroom, Robbey, Penn York and Trux which were delivered to [Pincus] as escrow agent(s).... [Pincus firms] have failed to account for, or turn over the escrow funds upon demand of the Trustee...." And, "[i]n failing to turn over, safeguard or otherwise account for the escrow funds, [Pincus] breached their duty(ies) to Mushroom, Robbey, Penn York and Trux." Amended Complaint, ¶¶ 31–34. The Pincus defendants deny receiving any funds that were not properly disposed of, and deny any breach of duty to their chapter 11 debtors-clients.

Finally, in Count VI ("Breach of Contract"), the trustee contends that the Pincus firms entered into a contract to act as escrow agents when Ganz signed the June 1987 stipulation with Continental. As escrow agents, the Pincus firms breached its contract "by releasing or allowing the release of funds to Ganz ... without any express, implied or apparent authorization." Amended Complaint, ¶¶ 48, 49. The defendants deny that they entered into an escrow agreement.

For the following reasons, I conclude that the trustee has proven two of his claims against the Pincus law firms.

### A.

■ In connection with Count I, the trustee seeks turnover from the Pincus law firms pursuant to either 11 U.S.C. § 542(a) or § 543(b). Those two subsections provide in relevant part:

(a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

\* \* \*

(b) A custodian shall—

(1) deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and

(2) file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody, or control of such custodian.

In the findings of fact, I found that the trustee proved that the Pincus law firms represented the chapter 11 debtors in possession. I also found that they had established an escrow account which held the deposits from prospective purchasers of Mushroom affiliate assets and which were used to pay a portion of Continental's secured claim as well as certain professional expenses associated with the chapter 11 case. That escrow account had been reduced to $1,165.91 by December 1989. Moreover, all funds in that account were transferred to Ganz when he left Pincus to join Astor, Weiss & Newman in 1989.

As will be discussed below, I also found that the trustee did not prove that the funds actually misappropriated by Ganz were those deposited into the Pincus law firm escrow account. Instead, it is more likely that the funds stolen by Ganz were, in effect, initially transferred from Continental Bank to bank accounts titled in Ganz's name—one at Fidelity Bank and one at Continental Bank.

Insofar as section 543 is concerned, this turnover obligation extends only to "custodians," a term defined by section 101(10) as:

(A) receiver or trustee of any of the property of the debtor, appointed in a case or proceeding not under this title;
(B) assignee under a general assignment for the benefit of the debtor's creditors; or
(C) trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors.

The legislative history explains that the term refers to "a prepetition liquidator of the debtor's property, such as an assignee for the benefit of creditors, a receiver of the debtor's property, or administrator of the debtor's property. The definition of custodian to include a receiver or trustee is descriptive, and not meant to be limited to court officers with those titles. The definition is intended to include other officers of the court if their functions are substantially similar to those of a receiver or trustee." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 310 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6267.

The Pincus firms were counsel to the chapter 11 debtors, not assignees for the benefit of creditors; nor were they receivers or trustees. Even if the law firm had obtained the Continental funds as escrow agent during the chapter 11 portion of the cases, it was not intended to serve as a distributing agent, and it would not be viewed as a custodian. *See In re U.S.A. Diversified Products, Inc.*, 196 B.R. 801, 805 (N.D.Ind.) ("The parties in this case do not dispute that Carlton, Fields [pre-bankruptcy counsel] was an entity other than a custodian [for purposes of section 542, even though] the firm had the $125,000.00 in its trust account during the case."), *aff'd*, 100 F.3d 53 (7th Cir.1996); *In re Rothwell*, 159 B.R. 374, 380 (Bankr. D.Mass.1993) (law firm had a duty to turn over settlement funds to the bankruptcy trustee pursuant to section 542, not section 543); *compare Matter of DeLancey*, 77 B.R. 424, 429 (Bankr.S.D.N.Y.1987) ("As an escrow agent appointed by the Court of Common Pleas for purposes of distribution of the funds, the Juniata Valley Bank was a 'custodian' of property of the estate."). Apparently, the trustee now agrees that the defendants were not custodians. *See* Trustee's Post–Trial Proposed Conclusion of Law, # 31.

Although section 543(b) does not apply on these facts, a law firm holding estate property may have a duty to turn over funds in its possession, custody or control

to a chapter 7 bankruptcy trustee, by virtue of section 542(a). *See, e.g., In re U.S.A. Diversified Products, Inc.,* 100 F.3d at 56–57; *In re Rothwell,* 159 B.R. at 380. Whether a law firm that formerly possessed estate property, but held no estate property when turnover litigation commenced, would be liable under section 542(a) is the subject of debate among courts.

Courts disagree whether a trustee may maintain an action in turnover against a defendant who did not have estate property at the time of the bankruptcy filing, or who no longer has possession of estate property at the time that turnover is sought. Since it is uncontroverted that Mr. Ganz embezzled these funds, and since the evidence is also clear that any funds in the Pincus escrow account were transferred by Ganz in 1989 when he joined the Astor, Weiss & Newman law firm, there is no doubt that the Pincus law firms are no longer in possession of estate property and had no such property at the inception of this adversary proceeding.

The Supreme Court explained that "[i]n effect, § 542(a) grants to the estate a possessory interest in certain property of the debtor that was not held by the debtor at the commencement of reorganization proceedings." *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 207, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). Consistent with this approach, some courts have concluded that when a non-trustee entity obtains estate property after the commencement of the case, any liability for such property is determined by 11 U.S.C. § 549 (governing post-bankruptcy transfers). *See Deckelbaum v. Cooter, Mangold, Tompert & Chapman, P.L.L.C.,* 275 B.R. 737,

741 (D.Md.2001); *In re 31–33 Corp.,* 100 B.R. 744, 747–48 (Bankr.E.D.Pa.1989). Other courts, however, do not view the language of section 542(a) so restrictively. *See In re Suncoast Towers South Associates,* 1999 WL 549678, at *13 (Bankr. S.D.Fla.1999).[21]

In addition, based upon a pre-Code Supreme Court decision, some courts view a turnover action as similar to one *in rem,* addressed solely to specific property or the identified proceeds thereof, which requires the defendant to be in possession or control of the property when the adversary proceeding is commenced. *See, e.g., Hager v. Gibson,* 109 F.3d 201, 210 (4th Cir. 1997) ("Present possession, either actual or constructive, of the property or its identifiable proceeds, by the person from whom its turnover is sought, is required for recovery under this section.") *In re Muniz,* 320 B.R. 697, 700 (Bankr.D.Colo.2005); *In re Robertson,* 105 B.R. 440, 455 (Bankr. N.D.Ill.1989) ("An action for turnover may not be maintained against one not in present possession of the property."); *In re De Berry,* 59 B.R. 891, 895–96 (Bankr. E.D.N.Y.1986) (" '[I]t is essentially a proceeding for restitution rather than indemnification, with some characteristics of a proceeding in rem; the primary condition of relief is possession of existing chattels or their proceeds capable of being surrendered by the person ordered to do so. It is in no sense based on a cause of action for damages for tortious conduct such as embezzlement, misappropriation or improvident dissipation of assets.' ") (quoting *Maggio v. Zeitz,* 333 U.S. 56, 63, 68 S.Ct. 401, 92 L.Ed. 476 (1948)); *see also In re Welded Constr., Inc.,* 339 F.2d 593, 594 (6th Cir.1964) (limiting a "turnover" pro-

---

**21.** The trustee argues that the Third Circuit has already concluded in *In re Mushroom Transp. Co.,* 382 F.3d 325 (3d Cir.2004), that the conversion of a case from chapter 11 to chapter 7 imposes a new duty of turnover thereby rendering section 549 inapposite. *See* Trustee's Post–Trial Proposed Conclusion of Law, # 31 n. 5. For purposes of this proceeding, I need not decide whether the Court of Appeals has so held.

ceeding to one falling within a bankruptcy court's summary jurisdiction under the former Bankruptcy Act).[22]

Other courts, based upon specific language of section 542(a) referring to "such property or the value of such property," permit a turnover action to be brought against a defendant who knew or should have known of the debtor's bankruptcy filing and that held property belonging to the debtor, whether or not the defendant still possessed the property at the time the action was brought. *See, e.g., Matter of USA Diversified Products, Inc.,* 100 F.3d 53, 56 (7th Cir.1996); *Deckelbaum v. Cooter, Mangold, Tompert & Chapman, P.L.L.C.,* 2000 WL 1593467, at *4 (D.Md. 2000).

In order to determine the Pincus firm's liability under Count I, I need not resolve these unresolved issues concerning the scope of section 542(a). If I assume the broadest statutory scope sought by the trustee, the statute also makes clear that turnover can only be demanded of an entity that had at least at one time "possession, custody, or control" of the specific estate property in question during the course of the bankruptcy case. *See In re Shearin,* 224 F.3d 353, 357 (4th Cir.2000); *see generally In re Dalow Industries, Inc.,* 333 B.R. 640, 642 (Bankr.E.D.N.Y.2005); *In re De Berry,* 59 B.R. 891, 895 (Bankr.

E.D.N.Y.1986) ("The clear language of the statute requires actual or constructive possession by a defendant as a fundamental predicate to a trustee's turnover rights.").

I agree with the trustee that estate funds placed into a law firm escrow account would be assets in possession, custody or control of the law firm and thus possibly subject to turnover (depending upon one's interpretation of section 542(a)). *See Matter of USA Diversified Products, Inc.* The evidence, however, demonstrates the likelihood that the Mushroom funds misappropriated by Ganz were never channeled through the law firm escrow account, but were transferred directly by Continental Bank to bank accounts titled in Ganz's name alone. The Pincus firm had no possession, custody or control of those funds: only Ganz did. Had Ganz not dissipated those funds and still held them in his Fidelity or Continental accounts, the Pincus law firm could not have gained access to them and transferred them to the trustee.[23] In other words, even if I accept *arguendo* that section 542(a) is broader than its Bankruptcy Act counterpart, it still does not give rise to a cause of action based solely upon the tortious conduct of a Pincus shareholder without evidence that the assets misappropriated were held by Pincus:

> person or entity intentionally diverts the property in breach of that relationship.
> *In re De Berry,* 59 B.R. 891, 896 (Bankr. E.D.N.Y.1986); *accord In re Bennett Funding Group, Inc.,* 2007 WL 777869, at *14 (Bankr. N.D.N.Y.2007).
> In this proceeding, there was no evidence that the Pincus law firm defendants intentionally diverted any Mushroom funds.

**23.** Indeed, it appears that the trustee may acknowledge that it was Ganz, not the Pincus firm, that had possession of estate property. *See* Trustee's Post–Trial Proposed Conclusion of Law, # 43 ("... Ganz's possession of estate property ...").

**22.** Two courts found an exception to the requirement that the property sought to be turned over be in the possession, custody or control of the defendant at the time turnover was demanded:

> There is an exception to the requirement that the defendant have possession of the property which emerged as a result of the Supreme Court's decision in *May v. Henderson,* 268 U.S. 111, 45 S.Ct. 456, 69 L.Ed. 870 (1925). The lack of possession is not an obstacle which will prevent the court from ordering a turnover of property, where there is a person or entity in a fiduciary relationship with the debtor and such

But this [turnover] procedure is one primarily to get at property rather than to get at a debtor. Without pushing the analogy too far, it may be said that the theoretical basis for this remedy is found in the common law actions to recover possession-detinue for unlawful detention of chattels and replevin for their unlawful taking-as distinguished from actions in trespass or trover to recover damages for the withholding or for the value of the property. Of course the modern remedy does not exactly follow any of these ancient and often overlapping procedures, but the object—possession of specific property—is the same. The order for possession may extend to proceeds of property that has been disposed of, if they are sufficiently identified as such. But it is essentially a proceeding for restitution rather than indemnification, with some characteristics of a proceeding in rem; the primary condition of relief is possession of existing chattels or their proceeds capable of being surrendered by the person ordered to do so. *It is in no sense based on a cause of action for damages for tortious conduct such as embezzlement, misappropriation or improvident dissipation of assets.*

*Maggio v. Zeitz* 333 U.S. 56, 63, 68 S.Ct. 401, 92 L.Ed. 476 (1948).

Accordingly, the Pincus law firm defendants have no liability on Count I.[24]

### B.

▮ Count II alleges that the Pincus law firm defendants breached their fiducia-ry duties to their Mushroom clients when Ganz stole the debtors' funds. The evidence at trial supports the trustee's claim for breach of fiduciary duty.

First, a chapter 7 trustee is empowered to assert claims, including breach of fiduciary duty claims, that a chapter 11 debtor in possession had prior to conversion. *See, e.g., In re R & R Associates of Hampton,* 402 F.3d 257, 264–65 (1st Cir.2005); *Donaldson v. Bernstein,* 104 F.3d 547, 554 (3d Cir.1997) (after conversion of a case from chapter 11 to chapter 7, the trustee had standing to prosecute a postpetition claim against the debtor's principals, which arose after the bankruptcy filing, but prior to conversion, for breach of their fiduciary duty). Indeed, in this proceeding, the Mushroom chapter 11 debtors lost their right to prosecute claims once their cases were converted and a chapter 7 trustee was appointed.[25] By virtue of section 323 of the Code, upon conversion of the case to chapter 7 and the appointment of a bankruptcy trustee, the trustee became the sole representative of the estate, and the proper party to assert claims of the estate. *See Donaldson v. Bernstein; In re NTG Industries, Inc.,* 118 B.R. 606 (Bankr. N.D.Ill.1990); *see generally Matter of Richman,* 104 F.3d 654, 657 (4th Cir.1997).

Second, an attorney representing a chapter 11 debtor in possession "owe[s] a broad-based duty of care, candor, and undivided loyalty to the chapter 11 debtor." *In re R & R Associates of Hampton,* 402 F.3d at 266. Indeed, attorneys to a chapter 11 debtor in possession owe their client a fiduciary duty. *See, e.g., ICM Notes,*

---

**24.** There were estate funds held by Pincus in its escrow account, but there was evidence that those funds were properly transferred to Continental and used to pay administrative expenses. Any remainder was taken by Ganz to his new law firm, Astor, Weiss & Newman and either properly used to pay administrative expenses or addressed by the trustee's resolved claims against that law firm.

**25.** The trustee contends, the Pincus defendants do not dispute, and I agree that Mushroom was converted to chapter 7 by express court order and that the affiliate cases were implicitly converted to chapter 7 when they were substantively consolidated with Mushroom's case.

*Ltd. v. Andrews & Kurth, L.L.P.*, 278 B.R. 117, 123 (S.D.Tex.2002) ("It is undisputed that counsel of a debtor-in-possession owes certain fiduciary duties to both the client debtor-in-possession and the bankruptcy court."); *In re Harp*, 166 B.R. 740, 748 (Bankr.N.D.Ala.1993); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 840 (Bankr.C.D.Cal.1991) ("[C]ounsel for a corporate Chapter 11 debtor in possession owes a fiduciary duty to the corporate entity estate—the client—and represents its interests, not those of the entity's principals.").

As explained by one court:

Pursuant to the Model Rules of Professional Conduct ("Model Rules"), counsel owes fiduciary duties of loyalty and care to his/her client, the debtor-in-possession. Counsel's duty of loyalty to the debtor-in-possession includes the duty to maintain client confidentiality and prevent any conflict of interest. *See* Model Rules of Professional Conduct Rules 1.6, 1.7, 1.8, 1.9, 1.10. The duty of care to the client encompasses the attorney's duty to abide by the client's decisions regarding legal objectives of the representation, to act competently and with reasonable diligence, to zealously represent the client, to keep the client reasonably informed as to the representation, and to exercise independent judgment and render candid advice. *See* Model Rules of Professional Conduct Rules 1.1, 1.2, 1.3, 1.4, 2.1.

*Hansen, Jones & Leta, P.C. v. Segal*, 220 B.R. 434, 454 (D.Utah 1998).[26]

Third, in this proceeding, it was the Pincus law firm, not Ganz individually, which was engaged to represent Mushroom and its affiliate debtors. Thus, it was the law firm, including its shareholder attorney Ganz, that had a fiduciary responsibility to its chapter 11 clients. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 341, 342–43, 347 n. 16 (3d Cir.2004); *In re J & J Record Distributing Corp.*, 80 B.R. 53 (Bankr.E.D.Pa.1987) (holding the Pincus law firm liable for the failure of one of its attorneys to invest chapter 11 funds in an interest-bearing escrow account).

Clearly, the theft of client funds by a member of a law firm constitutes a breach of fiduciary duty. *See, e.g., Matter of Cook*, 49 F.3d 263, 267 (7th Cir.1995) ("Only theft from a trust fund would be a clearer breach of an attorney's fiduciary duty to his client[.]"); *Kentucky Bar Ass'n v. Roberts*, 141 S.W.3d 366 (Ky.2004). The Pincus law firm defendants do not dispute this.[27] Instead, the defendants maintain that Ganz acted on his own, for his own benefit, without their knowledge, and thus the law firm should not be held liable. They rely upon *Solomon v. Gibson*, 419 Pa.Super. 284, 615 A.2d 367 (1992), which held:

It is true that a principal is liable to innocent third parties for the frauds, deceits, concealments, misrepresentations, torts, negligences and other malfeasances or misfeasances of his agent committed in the course of his employment, although the principal did not authorize, justify or participate in, or indeed know of, such misconduct, or even if he forbade the acts or disapproved of them. *Aiello v. Ed Saxe Real Estate, Inc.*, 508 Pa. 553, 559, 499 A.2d 282, 287 (1985). However, in a case such as this, where the agent acts in his own interest

---

**26.** Pennsylvania's Rule of Professional Conduct are based upon the Model Rules. *See Davisair, Inc. v. Butler Air, Inc.*, 40 Pa. D. & C.4th 403, 408, 1998 WL 1112611 (Pa.Com. Pl.1998).

**27.** The trustee also argues that the Pincus firms breached their fiduciary duties by not complying with Pennsylvania Rules of Professional Conduct 1.15 and 1.16. I need not reach that issue since theft of client funds is a clear breach of duty.

which is antagonistic to that of his principal, or commits a fraud for his own benefit in a matter which is beyond the scope of his actual or apparent authority or employment, the principal who has received no benefit therefrom will not be liable for the agent's tortious act.

*Id.,* at 293–29, 615 A.2d 367; *accord Todd v. Skelly,* 384 Pa. 423, 429, 120 A.2d 906 (1956).

Application of this state law principle, however, would not absolve the Pincus law firms from liability. The law firm served as counsel to the debtor and the law firm entrusted that representation to Ganz by 1986. In stealing Mushroom funds beginning in 1987, Ganz was purporting to act as counsel to the debtor; indeed, he obtained the funds from Continental in such capacity. In misappropriating those assets, some of which he apparently used to pay chapter 11 administrative expenses of his law firm, he was not acting in a manner antagonistic to the firm, but only acted adversely to the debtor and its creditors. Accordingly, unless the defendants' affirmative limitations defense is demonstrated, these defendants would be liable for breach of fiduciary duty for their shareholder agent's conduct. *See Rubin Quinn Moss Heaney & Patterson, P.C. v. Kennel,* 832 F.Supp. 922, 932–33 (E.D.Pa.1993); *In re Summit Airlines, Inc.,* 160 B.R. 911 (Bankr.E.D.Pa.1993); *Fornes v. Wright,* 91 Iowa 392, 59 N.W. 51 (1894) (law firm liable for theft of client assets).

**C.**

■ I next turn to Count VI, wherein the trustee contends that the Pincus law firm defendants breached their contract to hold the Continental funds in escrow.

■ Certainly, under Pennsylvania law, an escrow agreement represents a contract which can be enforced when breached. *See Walton v. Philadelphia Nat'l Bank,* 376 Pa.Super. 329, 338, 545 A.2d 1383 (1988) ("An escrow agreement is a contract and is to be interpreted according to contract principles."); *Iyengar v. PNC Nat'l Bank,* 1995 WL 808354, 25 Pa. D. & C.4th 7 (Pa. Com. Pleas 1995). Similarly, a party who has agreed to fund an escrow account and fails to do so may be liable for breach of contract. *See Burrell Constr. & Supply Co. v. Straub,* 440 Pa.Super. 596, 656 A.2d 529 (1995). And stipulations made in court are interpreted and enforced as contracts. *See, e.g., Pennwalt Corp. v. Plough, Inc.,* 676 F.2d 77, 79 (3d Cir.1982) ("[T]he settlement agreement is a contract and subject to the rules of contract interpretation."); *Ragnar Benson, Inc. v. Hempfield Twp. Mun. Authority,* 916 A.2d 1183, 1188 (Pa.Super.2007).

In this proceeding, the trustee has proven that on June 12, 1987, Mushroom, Continental Bank, the official committee of unsecured creditors, and the Estate of Robert Cutaiar entered into a settlement agreement wherein the Pincus law firm agreed to hold certain estate funds in escrow.[28] Ganz had authority to act as agent

---

**28.** Actually, Mushroom never authorized Ganz to act on its behalf in entering into this agreement. To the extent that express authority to settle was needed, *see generally Reutzel v. Douglas,* 582 Pa. 149, 154, 870 A.2d 787 (2005) ("The law in this jurisdiction is clear and well-settled that an attorney must have express authority in order to bind a client to a settlement agreement."), Mushroom's agent, Arnold, apparently ratified the agreement in February 1988 when he learned of it and did not protest. *See, e.g., Yarnall v.*

*Yorkshire Worsted Mills,* 370 Pa. 93, 96, 87 A.2d 192 (1952) ("A client ratifies his attorney's act if he does not repudiate it promptly upon receiving knowledge that the attorney has exceeded his authority."); *Piluso v. Cohen,* 764 A.2d 549, 551 (Pa.Super.2000) ("It is also clear that where a litigant does not attempt to repudiate immediately the authority of his counsel to enter into a settlement, but rather accepts the benefits flowing from the settlement, he ratifies the act of the attorney and will not be later heard to claim that his

for the law firm. *In re Mushroom*, 382 F.3d at 345–46. Therefore, through Ganz, the Pincus firm had agreed to collect and preserve the Mushroom assets later stolen by Ganz. The breach occurred when Ganz, the law firm's agent, never placed the funds in escrow. *Id.* at 338 (contract was breached no later than August of 1987).[29] Thus, the trustee has proven that the Pincus defendants breached this contract.

### D.

Having concluded that the trustee has presented sufficient evidence to establish claims against the Pincus law firm defendants for breach of fiduciary duty and for breach of contract, I must review the evidence for damages.

■ For breach of contract, Pennsylvania law requires "that a party seeking damages for breach of contract 'must be able to prove such damages with reasonable certainty.'" *Exton Drive-In, Inc. v. Home Indem. Co.* 436 Pa. 480, 488, 261 A.2d 319 (1969) (quoting *Wilcox v. Regester*, 417 Pa. 475, 484, 207 A.2d 817 (1965)). "[C]ompensation for breach of contract cannot be justly refused because proof of the exact amount of loss is not produced, for there is judicial recognition of the difficulty or even impossibility of the production of such proof. What the law does require in cases of this character is that the evidence shall with a fair degree of probability establish a basis for the assessment of damages." *Massachusetts Bonding & Ins. Co. v. Johnston & Harder, Inc.*,

343 Pa. 270, 280, 22 A.2d 709 (1941); *accord LBL Skysystems (USA), Inc. v. APG–America, Inc.*, 319 F.Supp.2d 515, 525 (E.D.Pa.2004).

■ Similarly, for breach of fiduciary duty, Pennsylvania does not permit an award of damages that are merely speculative. *See Werther v. Rosen*, 2003 WL 1861579, at *3 (Pa.Com.Pl.2003). "Clearly, 'when it is alleged that an attorney has breached his professional obligations to his client, an essential element of the cause of action, whether the action be denominated in assumpsit or trespass, is proof of actual loss.'" *Rizzo v. Haines*, 520 Pa. 484, 504–505, 555 A.2d 58 (1989) (quoting *Duke & Co. v. Anderson*, 275 Pa.Super. 65, 73–74, 418 A.2d 613 (1980)); *see generally Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 178 (3d Cir.2005) (plaintiff has the burden of proving damages for breach of fiduciary duty to a "reasonable certainty" under Wisconsin law); *Micale v. Bank One N.A.*, 382 F.Supp.2d 1207, 1224 (D.Colo.2005) (plaintiff has the burden of proof to demonstrate damages for breach of fiduciary duty).

The measure of damages in this proceeding on either of the two established causes of action would be the amount of Mushroom money misappropriated by Ganz, or, if not stolen by Ganz, wrongfully retained by the Pincus firms. The audit undertaken by the office of the United States trustee was able to trace $569,940.07 of Mushroom funds formerly

attorney acted without authority."), *appeal denied*, 568 Pa. 633, 793 A.2d 909 (2002).

29. Accordingly, while I agree with the trustee that an escrow agreement is a contract, the breach of which can give rise to a claim, *see, e.g., Perkins v. Clinton State Bank*, 593 F.2d 327, 331–32 (8th Cir.1979), I construe the June 1987 stipulation as a binding promise by the Pincus law firm to serve as escrow agent, rather than an escrow agreement itself. *Cf.*

*Burrell Const. & Supply Co. v. Straub*, 440 Pa.Super. at 601, 656 A.2d 529 ("[T]he failure of appellant Straub to fund the escrow account as required by the asset purchase and escrow agreements was a breach of contract which caused damage to appellee."). *Compare Williams v. Northside Realty Associates, Inc.*, 116 Ga.App. 253, 157 S.E.2d 166 (1967) (broker who had agreed to act as escrow agent does not breach any contract when the purchaser never placed any funds in escrow).

held by Continental that were stolen by Ganz. There was no persuasive evidence that the Pincus firms continued to hold any estate property or that the firm, besides Ganz, misused that property.

Although the trustee offered a myriad of exhibits reflecting funds deposited into the Pincus law firm escrow account, he could not trace that account. Thus, it is possible that those funds were properly spent during the administration of this case.

Despite the findings of the United States trustee's audit, the trustee contends that he has proven damages in the amount of $1,039,247.34. Trustee's Post-trial Proposed Conclusion of Law, # 89. The trustee reaches this figure by taking the sum found misappropriated by the United States trustee, $569,940.07, adding to it the $200,000 that the U.S. trustee's audit team could not trace due to the unavailability of records, adds to this sum another $204,307.27 that the trustee believes is the aggregate amount of money paid into the law firm escrow fund in connection with real estate sales, plus $65,000, representing the collateral held by Continental as security for a letter of credit, which sum was paid to the Pincus firm in March 1989. The trustee then contends that the evidentiary burden shifted to the defendants to prove that the funds were not misused by Ganz or by other members of the firm.

In support of his theory that—once the plaintiff demonstrated that the Pincus law firms breached their fiduciary duty to the bankruptcy estate due to the criminal conduct of one of its shareholders—the fiduciary has the burden to prove the extent of the loss, the trustee cites to *Estate of Stetson*, 463 Pa. 64, 84, 345 A.2d 679 (1975), which held:

In general, one who seeks to surcharge a trustee bears the burden of proving that the trustee breached an applicable fiduciary duty.... However, when a beneficiary has succeeded in proving that the trustee has committed a breach of duty and that a related loss has occurred, we believe that the burden of persuasion ought to shift to the trustee to prove, as a matter of defense, that the loss would have occurred in the absence of a breach of duty.... [FN15] *cf. Restatement (Second) of Trusts* § 212(4) (1959). We believe that, as between innocent beneficiaries and a defaulting fiduciary, the latter should bear the risk of uncertainty as to the consequences of its breach of duty.

n.15 '(T)he burden of proof should be on the defaulting trustee clearly to disestablish causal connection between default and loss to the beneficiary, rather than the contrary.'

(citations omitted).

As will be discussed below, I agree with the trustee that it is appropriate in this proceeding to consider Pennsylvania law, which has incorporated the Restatement (Second) of Trusts, as it applies to state law fiduciaries. *See also* Trustee's Proposed Conclusion of Law, # 59. However, in *Stetson*, the plaintiff had proved the amount of its damage claim, and the only dispute was whether the defendant caused those damages by improper conduct. The Pennsylvania Supreme Court held only that the defendant had the burden to demonstrate that its improper conduct did not cause those damages proven by the plaintiff to have occurred.

■ In this proceeding, however, although the improper conduct has been established, the measure of damages caused cannot be calculated because the records needed for tracing are unavailable and have been for many years. In essence, the trustee is attempting to shift to the defendants the duty to prove the precise amount that Ganz did not steal. I do not agree that such a burden rested upon them.

The only evidence suggesting that Ganz may have stolen more than the amount discovered by the United States trustee comes from Ganz's plea to a larger sum, and his insistence that there remained a Liberty bank account in the name of Trux that had not been dissipated. The significance of the plea figure was undermined, though, by Ganz's acknowledgement that he did not know if that sum, $781,000, was accurate and he did not care because it did not affect his criminal sentence. There was no evidence to establish the basis upon which the United States attorney arrived at this figure. *See generally U.S. v. Wight*, 839 F.2d 193, 197 (4th Cir.1987) (amount in plea agreement was not preclusive measure of damages in civil action).

Accordingly, I conclude that the trustee has proven that the Pincus firm damaged the estate in the amount of $569,940.07, as determined by the audit of the United States trustee, and by $60,000, which Ganz insisted in his deposition testimony remained on account at Liberty Bank. Total damages are thus $629,940.07.

■ Moreover, Pennsylvania permits prejudgment interest to be awarded for breach of contract litigation. *See Benefit Trust Life Ins. Co. v. Union Nat'l Bank of Pittsburgh*, 776 F.2d 1174, 1178 (3d Cir. 1985). As early as 1955, the Pennsylvania Supreme Court concluded that the payment of prejudgment interest in contract actions was a component of common law in this state:

> Plaintiffs were entitled to interest at the rate of 6% per annum from the time when they should have been paid for the services rendered by them. In all cases of contract interest is allowable at the legal rate from the time payment is withheld after it has become the duty of the debtor to make such payment; allowance of such interest does not depend upon discretion but is a legal right.... It is a right which arises upon breach or discontinuance of the contract provided the damages are then ascertainable by computation and even though a bona fide dispute exists as to the amount of the indebtedness.

*Palmgreen v. Palmer's Garage, Inc.*, 383 Pa. 105, 108, 117 A.2d 721 (1955) (citations omitted).

This entitlement follows acceptance by Pennsylvania courts of the provisions of the Restatement of Contracts § 337, later Restatement (Second) of Contracts § 354 (1979). *See, e.g., Penneys v. Pennsylvania R. Co.*, 408 Pa. 276, 280, 183 A.2d 544 (1962); *Somerset Community Hosp. v. Allan B. Mitchell & Associates, Inc.*, 454 Pa.Super. 188, 202, 685 A.2d 141 (1996).

Prejudgment interest accrues at the legal rate, which in Pennsylvania is 6%, simple interest. *See* 41 P.S. § 202; *Fortney v. Tennekoon*, 1998 WL 159047, at *15 (E.D.Pa.1998). There were 5,323 days between October 5, 1992 when this case commenced against these plaintiffs and May 3, 2007. At a per diem rate ($103.55), prejudgment interest totals $551,196.65.

Therefore, unless defendants' affirmative defense is sustained, the trustee would be entitled to a damage award totaling $1,181,136.72

## IV.

### A.

Upon my review of the defendants' post-trial submissions, the Pincus firms do not vociferously deny that the law firms are liable for the theft of client assets by one of their member attorneys. *See generally Rubin Quinn Moss Heaney & Patterson, P.C. v. Kennel*, 832 F.Supp. at 932; *In re Summit Airlines, Inc.*, 160 B.R. 911 (Bankr.E.D.Pa.1993); *cf. In re J & J Record Distributing Corp.*, 80 B.R. 53 (law firm liable for failure of an attorney to properly invest estate property). They do

vigorously assert the affirmative defense of the statute of limitations. And much of the evidence offered at trial was directed to this limitations issue.

There is no dispute that this lawsuit commenced on October 5, 1992. There is also no dispute that Ganz first began his embezzlement of Mushroom assets in July 1987. The Third Circuit has instructed that Pennsylvania limitations law applies to Counts II and VI of the amended complaint. *In re Mushroom Transp. Co.*, 382 F.3d at 336. Moreover, the appellate court further examined state law and concluded that the limitations period for breach of fiduciary duty was two years and for breach of contract was four years. *Id.* Finally, the Third Circuit observed that "absent application of tolling principles, the common law tort and contract claims accrued no later than August of 1987, when Continental completed the transfer of funds to Ganz per the Stipulation." *Id.* at 338.

The Court of Appeals borrowed the statute of limitations for these counts from Pennsylvania law. *Id.* at 335–36; *see Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 355, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991); *Oneida County, N.Y. v. Oneida Indian Nation of New York State*, 470 U.S. 226, 240, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985).

Because the trustee's lawsuit commenced years after the running of the relevant limitations periods, unless there is some equitable basis to toll the statutes of limitation, the trustee's proceeding against the Pincus law firms would be untimely. And were the Pincus law firm defendants able to escape legal liability to the trustee due to such delay, this result would not offend Pennsylvania jurisprudence:

> One policy expressed by statutes of limitation is set forth in the phrase "vigilantibus non dormientibus subvenient legis," *Forster v. Cumberland Valley R. Co.*, 23 Pa. 371[, 1854 WL 6361] (1854), which may be freely, and at the same time woodenly, translated as the "law lends its aid only to those who exercise diligence in invoking it." *Thorne's Estate*, 344 Pa. 503, 515, 25 A.2d 811, 817 (1942). Thus, statutes of limitation have been described as "expressive of the feeling of mankind that where there are wrongs to be redressed, they should be redressed without unreasonable delay, and where there are rights to be enforced, they should be enforced without unreasonable delay," *Ulakovic v. Metropolitan Life Ins. Co.*, 339 Pa. 571, 575–76, 16 A.2d 41, 43 (1940); the "genius and purpose" of such statutes have been described as "stimulat(ing) men to diligence in business to promptness in looking after their rights to litigation, if it must be had, whilst evidence is living and fresh, and at hand," *Fleming v. Culbert*, supra at 500[, 1864 WL 4578].
>
> A second policy expressed by statutes of limitation is that even though someone may have been a wrongdoer, after a certain period of time he should have repose and be spared the inconvenience and prejudice that may result from attempting to defend himself against a stale claim.... This policy of repose may be regarded as especially for the protection of the particular defendant, but it also has a public dimension; thus it has been said that it is "a great public evil that estates should be forever in jeopardy and that no end should be put to stale controversies." *Kenyon v. Stewart*, 44 Pa. 179, 191[, 1863 WL 4778] (1863).
>
> A third policy expressed by statutes of limitation, one more concerned perhaps with society in general than with the particular defendant, is a policy of administrative convenience and efficiency; it is awkward and wasteful for judicial

resources to be used to decide stale claims on stale evidence.

*Anthony v. Koppers Co.,* 284 Pa.Super. 81, 425 A.2d 428 (1980), (citations omitted), *rev'd on other grds,* 496 Pa. 119, 436 A.2d 181 (1981).

In determining whether any tolling principle applies to these two causes of action, once again Pennsylvania law is relevant. "Along with state statutes of limitations, a borrowing court 'must also borrow from state law the relevant tolling principles.'" *In re Mushroom Transp. Co.,* 382 F.3d at 335 (quoting *Island Insteel Systems, Inc. v. Waters,* 296 F.3d 200, 210 n. 4 (3d Cir.2002)); *accord Weis–Buy Services, Inc. v. Paglia,* 411 F.3d 415, 422 (3d Cir. 2005).

The core of this trial concerned the trustee's assertion, and the defendants' challenge, that the statute of limitations should be tolled until February 1992, when the predecessor trustee learned of Ganz's misconduct from the United States trustee.

### B.

The only state-recognized tolling principle germane to this dispute is the so-called "discovery rule." [30]

[A]pplication of the rule has been based upon the recognition that if a party, despite the exercise of diligence, cannot ascertain his injury, the statute of limitations should not run against his claim. In short, the discovery rule is a judicial creation, fashioned to solve a specific problem, namely, whether the law should preclude recovery for an injury that not even a diligent party may reasonably be expected to discover.

*Anthony v. Koppers Co., Inc.,* at 432. Pennsylvania courts have further explained the purpose of the discovery rule in these terms:

whether there has been some affirmative independent act of concealment on behalf of the defendants and, if so, whether plaintiffs justifiably relied on that affirmative independent act of concealment." *See IEJ Corp. v. Laserow,* 75 Pa. D. & C.4th 138, 145–46, 2005 WL 2812254 (Pa.Com.Pl.2005).

Here, the trustee has offered no evidence of any affirmative act by the defendant Pincus law firms to conceal Ganz's misconduct. *See generally Robinson v. Dalton,* 107 F.3d 1018, 1022–23 (3d Cir.1997); *In re A.J. Lane & Co.,* 167 B.R. 729, 731–32 (Bankr.D.Mass.1994). His suggestion, *see* Trustee's Proposed Legal Conclusions, # # 116–18, that letters sent in November 1990 and May 1991 should be so viewed overlooks that these letters were sent while Ganz was with Astor, Weiss & Newman, and that firm had entered its appearance as substitute debtor's counsel effective December 1989.

Moreover, I also find unpersuasive the trustee's post-trial suggestion, *see* Proposed Legal Conclusion, # 100, that the tolling theory of "adverse domination" is applicable. *See generally In re Lloyd Securities, Inc.,* 153 B.R. 677, 684–85 (E.D.Pa.1993).

Thus, the parties have properly focused upon the discovery rule.

**30.** Another doctrine recognized in Pennsylvania, which also tolls the running of the statute of limitations, is referred to as fraudulent concealment. *See, e.g., Fine v. Checcio,* 582 Pa. 253, 270, 870 A.2d 850 (2005).

The doctrine is based on a theory of estoppel, and provides that the defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts.... The doctrine does not require fraud in the strictest sense encompassing an intent to deceive, but rather, fraud in the broadest sense, which includes an unintentional deception.... The plaintiff has the burden of proving fraudulent concealment by clear, precise, and convincing evidence.

*Id.* at 271, 870 A.2d 850. "[I]n order for fraudulent concealment to toll the statute of limitations, the defendant must have committed some affirmative independent act of concealment upon which the plaintiffs justifiably relied." *Kingston Coal Co. v. Felton Mining Co.,* 456 Pa.Super. 270, 284, 690 A.2d 284 (1997). "Thus, in determining whether the doctrine of fraudulent concealment tolls the statute of limitations, the court must focus on

In some cases, however, the delay in bringing the action is not in any way the fault of the injured party. This is so in cases where the discovery rule has been applied, for a "person cannot be said to have been 'sleeping on his rights' when he does not know and reasonably could not have known that he had such rights." *Raymond v. Eli Lilly & Co., supra* at 170, 371 A.2d at 174, quoting *Wyler v. Tripi*, 25 Ohio St.2d 164, 178, 267 N.E.2d 419, 427 (1971).... In such cases application of the statute of limitation to bar the action would no doubt promote repose, and might also promote administrative convenience and efficiency, but it would not promote diligence or, conversely, penalize the lack of diligence, for the plaintiff would be penalized despite the fact and even though the exercise of diligence would not have led him to bring the action sooner. The policy question thus presented in the discovery cases has been: If a plaintiff cannot discover his injury or its cause, even when exercising diligence, should the law nevertheless bar his action in the interest of preserving repose and administrative convenience and efficiency? The answer uniformly given by the courts of this state and other jurisdictions has been that the law should not bar the action. The "policy of repose is outweighed where the interests of justice require vindication of the plaintiff's rights," *Burnett v. New York Central R. Co.*, 380 U.S. 424, 428[, 85 S.Ct. 1050, 13 L.Ed.2d 941] (1965)....

*Id.* at 441–42 (citations omitted).[31]

The Pennsylvania Supreme Court's most recent explication of the common law discovery rule occurred in *Fine v. Checcio*, 582 Pa. 253, 870 A.2d 850 (2005). "[W]e hold that it is not relevant to the discovery rule's application whether or not the prescribed period has expired; the discovery rule applies to toll the statute of limitations in any case where a party neither knows nor reasonably should have known of his injury and its cause at the time his right to institute suit arises." *Id.* at 269, 870 A.2d 850. The Supreme Court summarized the proper application of this tolling principle for Pennsylvania trial courts:

As the discovery rule has developed, the salient point giving rise to its application is the inability of the injured, despite the exercise of reasonable diligence, to know that he is injured and by what cause. *Pocono International*, [503 Pa. 80,] 468 A.2d [468] at 471 [(1983)]. We have clarified that in this context, reasonable diligence is not an absolute standard, but is what is expected from a party who has been given reason to inform himself of the facts upon which his right to recovery is premised. As we have stated: " '[T]here are [very] few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence.' " *Crouse v. Cyclops Industries*, 560 Pa. 394, 745 A.2d 606, 611 (2000) (quoting *Deemer v. Weaver*, 324 Pa. 85, 187 A. 215, 217 (1936) (citation omitted)). Put another way, "[t]he question in any given case is not, what did the plaintiff know of the injury done him? [B]ut, what might he have known, by the use of the means of information within his

---

**31.** While the discovery rule is not applicable to all Pennsylvania state law claims, *see Hollywood v. First Nat. Bank of Palmerton*, 859 A.2d 472 (Pa.Super.2004) (inapplicable when the claim involves conversion of negotiable instruments), *appeal denied, sub nom., Estate of Hollywood v. First Nat. Bank of Palmerton*, 583 Pa. 672, 876 A.2d 396 (2005), I agree with the trustee that the discovery rule would apply to state law claims for breach of contract and breach of fiduciary duty.

reach, with the vigilance the law requires of him?" *Scranton Gas & Water Co. v. Lackawanna Iron & Coal Co.,* 167 Pa. 136, 31 A. 484, 485 (1895). While reasonable diligence is an objective test, "[i]t is sufficiently flexible ... to take into account the difference[s] between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question." *Crouse,* 745 A.2d at 611 (quotation omitted). Under this test, a party's actions are evaluated to determine whether he exhibited "those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interest and the interest of others." *Id.* Therefore, when a court is presented with the assertion of the discovery rules application, it must address the ability of the damaged party, exercising reasonable diligence, to ascertain that he has been injured and by what cause. *Id.* Since this question involves a factual determination as to whether a party was able, in the exercise of reasonable diligence, to know of his injury and its cause, ordinarily, a jury is to decide it. . . . Where, however, reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause, the court determines that the discovery rule does not apply as a matter of law. . . .

When the discovery rule applies, the statute of limitations does not commence to run at the instant that the right to institute suit arises, i.e., when the injury occurs. *Id.* at 611; *Ayers,* 154 A.2d at 791. Rather, the statute is tolled, and does not begin to run until the injured party discovers or reasonably should discover that he has been injured and that his injury has been caused by another party's conduct. *Id.* Whether the statute of limitations has run on a claim

is a question of law for the trial court to determine; but the question as to when a party's injury and its cause were discovered or discoverable is for the jury. . . .

*Id.* at 266–268, 870 A.2d 850 (citations omitted).

In their capacities as debtors in possession, Mushroom and its affiliate companies had the exclusive right to prosecute all claims which belonged to their respective bankruptcy estates. *See, e.g., Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149, 1154 n. 6 (3d Cir.1989); *Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233, 246 (5th Cir.1988). "Property of the estate" is defined by the broad terms of section 541(a) of the Code, which definition includes the "proceeds" and "offspring" of such property. 11 U.S.C. § 541(a)(6). Since the sale proceeds of estate property deposited with Continental Bank constituted estate property, so would the right to seek recovery of estate property wrongfully taken. *See Donaldson v. Bernstein,* 104 F.3d at 554 (after conversion of a case from chapter 11 to chapter 7, the trustee had standing to prosecute a postpetition claim against the debtor's principals, which arose after the bankruptcy filing, but prior to conversion, for breach of their fiduciary duty).

Of course, these chapter 11 debtors lost that right to prosecute claims once their cases were converted and a chapter 7 trustee was appointed. By virtue of section 323 of the Code, upon conversion of the case to chapter 7 and the appointment of a bankruptcy trustee, the trustee became the sole representative of the estate and so the proper party to assert claims of the estate. *See Donaldson v. Bernstein; In re NTG Industries, Inc.; see generally Matter of Richman,* 104 F.3d at 657. But the chapter 7 trustee succeeds to the interests of the chapter 11 debtors and may only

prosecute claims of the estate, and not claims belonging to individual creditors. *See generally, e.g., Caplin v. Marine Midland Grace Trust Co. of New York,* 406 U.S. 416, 429, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972); *In re MS55, Inc.,* 477 F.3d 1131, 1138 (10th Cir.2007) (upon conversion, "a Chapter 7 trustee succeeds only to the rights of the debtor-in-possession"); *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 118 (2d Cir.1991) ("Under the Bankruptcy Code the trustee stands in the shoes of the bankrupt corporation and has standing to bring any suit that the bankrupt corporation could have instituted had it not petitioned for bankruptcy.").

Accordingly, while the chapter 7 trustee has standing to assert claims which belonged to the bankruptcy estates of the debtors in possession, the trustee is subject to all restrictions, including affirmative defenses, which could be raised, were the Mushroom debtors still able to bring the action themselves. *See, e.g., Stumpf v. Albracht,* 982 F.2d 275, 277–78 (8th Cir. 1992) (chapter 11 trustee's tort claim is barred by the statute of limitations because the limitations period began to run when the chapter 11 debtors in possession knew or should have known of the claim; "the trustee must stand in their shoes"); *Paul v. Monts,* 906 F.2d 1468, 1473 (10th Cir.1990) ("The trustee, as successor to the debtor in possession, is bound by his predecessor's authorized actions"); *Matter of Gebco Inv. Corp.,* 641 F.2d 143, 146 (3d Cir.1981); *In re Fineberg,* 202 B.R. 206, 227 (Bankr.E.D.Pa.1996) ("Further, a trustee is bound by the prior actions of a party to whose rights he succeeds."); *In re Buzzworm, Inc.,* 178 B.R. 503, 508 (Bankr.

D.Colo.1994) (" '[I]t is axiomatic that the Trustee is bound by the acts of the debtor-in-possession . . . in entering into the three stipulations.' ") (quoting *Armstrong v. Norwest Bank, Minneapolis, N.A.,* 964 F.2d 797, 801 (8th Cir.1992)); *see generally Integrated Solutions, Inc. v. Service Support Specialties, Inc.,* 124 F.3d 487, 492 (3d Cir.1997) (" 'Once a property interest has passed to the estate, it is subject to the same limitations imposed upon the debtor by applicable nonbankruptcy law.' ") (quoting *In re American Freight Sys., Inc.,* 179 B.R. 952, 960 (Bankr.D.Kan. 1995)).[32]

As the causes of action for counts II and VI arose, absent tolling, long prior to the conversion of the case, and absent tolling would have expired prior to the commencement of this adversary proceeding, one must consider whether the Mushroom debtors in possession, as well as the chapter 7 trustee, exercised due diligence.

Before addressing the concept of due diligence—in this case, whether the trustee and his predecessors in interest, the debtors in possession, exhibited "those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interest and the interest of others," *Fine v. Checcio,* 582 Pa. at 267, 870 A.2d 850—I note that Pennsylvania imposes the burden of establishing the elements of the discovery rule upon the party seeking its application:

> [T]he discovery rule is an exception to the general rule that the statute of limitations begins to run as soon as the right to institute and maintain a suit

---

**32.** The trustee seeks to avoid the defendants' affirmative defense by unpersuasively contending that the statute of limitations is re-triggered upon conversion of the case to chapter 7. *See* Trustee's Proposed Conclusion of Law, # 99. However, section 546(a), by its express terms is inapplicable to the claims raised in this proceeding, as is section 108(a). The latter provision concerns the "order for relief," which is defined in section 301 as the date a voluntary bankruptcy petition is filed and does not change upon conversion of a bankruptcy case. 11 U.S.C. § 348(a).

arises. *Pocono,* 503 Pa. at 84, 468 A.2d at 471. Therefore, one claiming the benefit of the exception bears the burden of establishing that she falls within it.

*Cochran v. GAF Corp.,* 542 Pa. 210, 216, 666 A.2d 245 (1995); *accord Vitalo v. Cabot Corp.,* 399 F.3d 536, 543 (3d Cir.2005); *Dalrymple v. Brown,* 549 Pa. 217, 224, 701 A.2d 164 (1997).

Therefore, it is the plaintiff/trustee's burden in this proceeding to establish the applicability of the discovery rule and thereby defeat the defendants' limitations defense.

### C.

Also before addressing the question of due diligence on the facts proven in this proceeding, given that its application should consider "difference[s] between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question," *Fine v. Checcio,* 582 Pa. at 267, 870 A.2d 850, it is relevant to analyze the various relationships of the parties in this adversary proceeding.

As discussed earlier, the Pincus law firm defendants, as authorized counsel to the chapter 11 debtors in possession, stood in a fiduciary capacity toward their clients. However, once a chapter 7 trustee is appointed there is no longer a debtor in possession; the chapter 7 debtor is not a fiduciary; and counsel for the chapter 7 debtor does not represent the trustee (unless appointed by the court, which would be unusual). *See In re NRG Resources, Inc.,* 64 B.R. 643, 646–47 (W.D.La.1986). Thus, debtor's counsel is not in a fiduciary relationship to the chapter 7 trustee upon conversion of the case.

Ganz, as a member of the Pincus law firms, acted in a fiduciary relationship with those firms with respect to legal matters entrusted to him by the firms:

During Defendant's tenure as an employee of Plaintiff's predecessor, he was in an agency relationship with the Plaintiff. As an agent, Defendant was "a fiduciary with respect to matters within the scope of his agency and [was] required to act solely for the benefit of his principal in all matters concerned with the agency." *SHV Coal, Inc. v. Continental Grain Co.,* 376 Pa.Super. 241, 545 A.2d 917, 921 (1988).... This duty of loyalty was breached by the Defendant when he used the Real Estate Accounts he was administering to make payments to advance his own interests, rather than those of his employer or of his employer's clients.

*Rubin Quinn Moss Heaney & Patterson, P.C. v. Kennel* 832 F.Supp. at 933 (citations omitted).

In addition to these two fiduciary relationships, the corporate chapter 11 debtors, Mushroom and its affiliate corporations, pursuant to 11 U.S.C. § 1107(a), were acting in a fiduciary relationship to their creditors while the case was in chapter 11:

Unlike in Chapter 7 proceedings, an outside trustee is not typically appointed in Chapter 11 proceedings. Rather, the default rule is that the debtor remains in control of the bankruptcy estate and operates its business as "debtor in possession." When acting as debtor in possession, the debtor is bound by all of the fiduciary duties of a bankruptcy trustee.

*In re Insilco Technologies, Inc.,* 480 F.3d 212, 215 n. 3 (3d Cir.2007); *accord, e.g., In re Coastal Group, Inc.,* 13 F.3d 81, 84 (3d Cir.1994). Thus,

if a debtor remains in possession—that is, if a trustee is not appointed—the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession. *Wolf v.*

*Weinstein,* 372 U.S. 633, 649–652[, 83 S.Ct. 969, 10 L.Ed.2d 33] (1963). Indeed, the willingness of courts to leave debtors in possession "is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee." *Id.,* at 651, 83 S.Ct., at 980.

*Commodity Futures Trading Com'n v. Weintraub,* 471 U.S. 343, 355, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985). Here, Mushroom and its affiliates acted through Arnold and, to a lesser extent, Robert B. Cutaiar in the exercise of their fiduciary duties.

The fiduciary role of counsel to the chapter 11 debtor in possession, in relation to the fiduciary role of the debtor in possession, has been described in typical nonbankruptcy attorney-client terms:

> Counsel's role with respect to the DIP's fiduciary duties, and DIP management agendas, is limited but critical. Counsel may exert some or even considerable influence on bankruptcy strategy, but management still makes the final decisions. Ethically and legally, DIP counsel can only advise the DIP's designated representative, who makes the decisions.

1 *Norton Bankr.L. & Prac.2d* § 27:6 (2007) (citing Model Rules of Professional Conduct 1.2 and 1.4) (footnotes omitted). To fulfill that role, chapter 11 debtor's counsel needs a client with the "capacity to make decisions and judgment to carry out the[ ] duties" of a debtor in possession. *In re Rivers,* 167 B.R. 288, 300 (Bankr. N.D.Ga.1994):

> Accepting representation of a fiduciary increases the weight of professional responsibility because the professional must take care that he or she is receiving valid instructions from a competent fiduciary acting within the scope of the fiduciary's trust. Although the line separating advice or assistance in perform-

ing duties from the actual performance of those duties is not always bright, the line exists, and a professional has no business making decisions that are the responsibility of the fiduciary.

*Id.* at 300. To the extent that a debtor in possession seeks to delegate specific fiduciary duties, such delegation should be on notice and with leave of court. *See In re Lowry Graphics, Inc.,* 86 B.R. 74, 76 (Bankr.S.D.Tex.1988). While abdication of all fiduciary responsibilities is improper, a debtor in possession can temporarily delegate some responsibilities to counsel in appropriate circumstances:

> While a trustee certainly should never completely and permanently delegate all responsibility for the bankruptcy estate, the temporary delegation of even the core duties of monitoring and holding custody of liquid assets to an attorney approved by the court could be reasonable and even advisable in the context of a lengthy, complicated bankruptcy proceeding.

*In re Mushroom Transp. Co., Inc.,* 247 B.R. 395, 402 n. 11 (E.D.Pa.2000) (relying, *inter alia,* upon 11 U.S.C. § 327).

Finally, Arnold himself, by agreeing to act as special liquidation consultant to the chapter 11 debtors, instructed to "oversee the liquidation and collection of the assets of Mushroom and its affiliates," was also acting in a fiduciary capacity toward those corporate entities. *See generally Heaney v. Riddle,* 343 Pa. 453, 456, 23 A.2d 456 (1942) (liquidating trustee of dissolving corporation had a fiduciary duty); *Robar Development Corp. v. Minutello,* 268 Pa.Super. 406, 410, 408 A.2d 851 (1979); *see also In re Allied Physicians Group, P.A.,* 2003 WL 21149493 (N.D.Tex.2003) (agent appointed under a liquidating chapter 11 plan held a fiduciary duty); *In re RDM Sports Group, Inc.,* 260 B.R. 905 (Bankr.N.D.Ga.2001) (bankruptcy consul-

tant sued for breach of fiduciary duty). Although Arnold's appointment only received court approval for six months, Arnold took it upon himself to continue in that role through 1989 and possible into 1990, and to pay himself at least $50,000 for such continued services.

In addition, when Arnold was elected chapter 7 trustee of the Mushroom estate in February 1991, he became the successor fiduciary to the chapter 11 debtor in possession. *See, e.g., In re Fordu*, 201 F.3d 693, 706 (6th Cir.1999) ("[A]fter conversion of a bankruptcy case from a reorganization to a liquidation proceeding, a Chapter 7 trustee often will be held to have been in privity with his predecessor fiduciary, *i.e.*, either the debtor-in-possession or Chapter 11 trustee.").

Among his responsibilities, the bankruptcy trustee is held "accountable for all property received during the course of the administration of an estate." 6 *Collier on Bankruptcy*, ¶ 704.05, at 704–12 (15th ed. rev.2006). Bankruptcy trustees, like state court executors and administrators, are bound to use reasonable diligence in the discharge of their duty to "collect and reduce to money the property of the estates for which they are trustees" and to secure possession of all the property and collect debts due. 6 *Collier on Bankruptcy*, ¶ 704.04[1]; *see also In re Johnson*, 518 F.2d 246, 251 (10th Cir.1975). Section 704(2) renders a bankruptcy trustee accountable for all property received by him or his agents. *See 6 Collier on Bankruptcy*, at ¶ 704.05. Among the chapter 7 trustee's duties, "the trustee must carefully preserve the estate's assets from deterioration or dissipation." *Id.*, ¶ 704.04[2] at 704–10.

A debtor in possession has an identical duty. *See Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 245–46 (5th Cir.1988):

Here, LWE was continued as the debtor-in-possession.... With certain exceptions not relevant here, a debtor-in-possession performs the same functions as a trustee in a reorganization.... The debtor-in-possession, therefore, "both enjoys the rights and must fulfill the duties of a trustee." *In re Hughes*, 704 F.2d [820] at 822 [(5th Cir.1983)].... As one of its duties, a trustee is not only entitled to but must collect the property of the estate.... Moreover, as the Supreme Court has held, "the trustee is 'accountable for all property received,' [11 U.S.C.] §§ 704(2), 1106(a)(1), and has the duty to maximize the value of the estate, see [11 U.S.C.] § 704(1)."

(quoting *Commodity Futures Trading Com'n v. Weintraub*, 471 U.S. at 352, 105 S.Ct. 1986) (citations and footnote omitted); *accord In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) ("[A]mong the fiduciary obligations of a debtor-in-possession is the 'duty to protect and conserve property in its possession for the benefit of creditors.' ") (quoting *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr.S.D.N.Y.1990)).

Thus, during the course of the Mushroom bankruptcy cases there have been multiple fiduciaries who had some duty to protect estate property. And in appropriate circumstances, they could rely upon their court approved attorney, also a fiduciary, to assist them in fulfilling that responsibility.

## V.

As the Court of Appeals has instructed, *In re Mushroom Transp. Co.*, 382 F.3d at 341, the existence of fiduciary duties owed by the Pincus law firm to its chapter 11 debtor-clients is an important consideration in determining whether the client exercised due diligence in discovering Ganz's defalcation. *See also Rubin Quinn*

*Moss Heaney & Patterson, P.C. v. Kennel,* 832 F.Supp. at 935 ("To require a principal to engage in aggressive oversight of its fiduciary's conduct is to deny the very essence of a fiduciary relationship."); *Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex. 1988). As will be discussed below, in application of the discovery rule, Pennsylvania law also makes relevant the background of the particular client as well as the nature of the fiduciary duty breached by counsel's conduct. *See also Robertson v. Central Jersey Bank & Trust Co.,* 47 F.3d 1268, 1276 (3d Cir.1995) (under New Jersey law, a testamentary trustee may need to exercise greater prudence than the ordinary person if he possesses greater skill than an ordinary person).[33]

Moreover, the fact that the client of a fiduciary is itself a fiduciary would also be germane. Numerous Pennsylvania court decisions have considered whether a fiduciary, such as a state law trustee, has acted with appropriate diligence or prudence, usually in the context of a challenge to the fiduciary's fee, or in adjudicating a request by a beneficiary to surcharge the fiduciary with monetary damages. Under state law, a surcharge may be assessed only where the fiduciary "was guilty of supine negligence in failing to exercise due diligence[.]" *In re Beaver Trust Co.* 146 Pa.Super. 545, 550, 22 A.2d 111 (1941). In other words, Pennsylvania law would equate a fiduciary's supine negligence with a lack of due diligence.

In considering whether a fiduciary's actions, or inaction, constituted supine negligence, Pennsylvania courts have endorsed the standard enunciated in the Restatement of Trusts, *id.* at 550, 22 A.2d 111 (citing Restatement of the Law of Trusts, § 176) and later, the Restatement (Second) of Trusts. *See, e.g., In re Milton Hershey School,* 590 Pa. 35, 911 A.2d 1258, 1260 (2006). Of particular relevance is Restatement (Second) of Trusts, § 225 (1959), when considering the due diligence of a fiduciary who uses an agent, such as an attorney, to assist in the exercise of fiduciary duties:

*Liability For Acts Of Agents*

(1) Except as stated in Subsection (2), the trustee is not liable to the beneficia-

---

**33.** The notion that diligence due from a plaintiff in a given dispute will be dependent upon a number of circumstances, including the relationship between the plaintiff and the defendant and the background and experience of the plaintiff, arises in other contexts. For example, in federal securities law litigation, the Third Circuit has explained:

> The "reasonable reliance" element of a Rule 10b–5 claim requires a showing of a causal nexus between the misrepresentation and the plaintiff's injury, as well as a demonstration that the plaintiff exercised the diligence that a reasonable person under all of the circumstances would have exercised to protect his own interests. *Straub v. Vaisman and Co., Inc.,* 540 F.2d 591, 597–98 (3d Cir.1976). In *Straub,* we identified a non-exclusive set of factors to aid in determining whether a party's reliance was reasonable under all of the circumstances. We noted that courts may consider (1) whether a fiduciary relationship existed between the

parties; (2) whether the plaintiff had the opportunity to detect the fraud; (3) the sophistication of the plaintiff; (4) the existence of long standing business or personal relationships; and (5) the plaintiff's access to the relevant information. See *id.* at 598. *AES Corp. v. Dow Chemical Co.,* 325 F.3d 174, 178–79 (3d Cir.2003); *see also Stephenson v. Paine Webber Jackson & Curtis, Inc.,* 839 F.2d 1095, 1099–1100 (5th Cir.1988); *see generally Restatement (Third) of Trusts* § 77 (Tentative Draft) (2005):

> (1) The trustee has a duty to administer the trust as a prudent person would, in light of the purposes, terms, and other circumstances of the trust.
> (2) The duty of prudence requires the exercise of reasonable care, skill, and caution.
> (3) If the trustee possesses, or procured appointment by purporting to possess, special facilities or greater skill than that of a person of ordinary prudence, the trustee has a duty to use such facilities or skill.

ry for the acts of agents employed by him in the administration of the trust. (2) The trustee is liable to the beneficiary for an act of such an agent which if done by the trustee would constitute a breach of trust, if the trustee

(a) directs or permits the act of the agent; or

(b) delegates to the agent the performance of acts which he was under a duty not to delegate; or

(c) does not use reasonable care in the selection or retention of the agent; or

(d) does not exercise proper supervision over the conduct of the agent; or

(e) approves or acquiesces in or conceals the act of the agent; or

(f) neglects to take proper steps to compel the agent to redress the wrong.

Thus, under state law, a fiduciary may not be liable for the improper acts of an agent attorney. For example (without express citation to the Restatement), a Pennsylvania trial court declined to hold a probate estate administratrix liable for the theft of estate property by the estate's attorney. *In re Hofmann's Estate*, 64 Montg. 194, 64 Pa. D. & C. 575, 1948 WL 3161 (Pa.Orph.1948). The court explained that the administratrix exercised due diligence and so was not guilty of supine negligence and thus not liable for the theft by her attorney-agent:

The collection of the assets of this estate presented problems of considerable complexity for an elderly woman who possessed no business experience and was further handicapped by her poor knowledge of the English language. The very reason for employing an attorney was to obtain the benefit of his professional skill and knowledge, and it would be manifestly unjust to penalize a client for the misconduct of the attorney where she merely followed his advice in good

faith and without reason to suspect his integrity.

*Id.* at 579–80, 1948 WL 3161. In discussing the administratrix's due diligence, the trial court then added:

Of course, if the administratrix had had any reason to suspect the attorney and then failed to take proper steps to collect the assets from him when it was possible to do so, she may properly be held liable for the loss.... But all the transactions here involved took place within a few months and the administratrix had no intimation whatsoever of the real situation until it was discovered after the attorney's death. Thereafter, she immediately took legal action against the bank which permitted him to deposit the estate checks in his personal account and she prosecuted the litigation vigorously albeit unsuccessfully. She also promptly investigated the possibility of recovering against the attorney's estate but learned that he died without any assets whatsoever. It must be concluded, therefore, that the administratrix acted with "common skill, common prudence and common caution", which was all that the law required of her....

*Id.* at 582–83, 1948 WL 3161 (citations omitted).

Similarly, in *In re Birkel's Estate*, 12 Pa. D. & C.2d 239, 1958 WL 5160, 34 Northam. 194 (Pa.Orph.1958), the trial court held that a probate trustee acted with due diligence and thus was not liable for theft of estate property by a rental agent:

The law in such matters does not make a trustee an insurer of the funds which come into his hands. He, in addition to being scrupulously honest, must only exercise good faith and reasonable care and diligence. He should not be surcharged unless he has violated his responsibilities by dishonest or careless dealings. Scott on Trusts, § 225, p.

1644, reads: "... a trustee ... is not liable to the beneficiaries for losses resulting from the improper conduct of the agent, unless the trustee is himself guilty of a breach of trust ... if in the administration of the trust the trustee properly employs an agent who negligently loses trust property entrusted to him or misappropriates such property or otherwise causes a loss to the trust estate, the trustee is not liable to the beneficiaries for the loss". *See also Hofmann's Estate,* 64 Pa. D. & C. 575, and cases therein cited.

In the instant case the testimony discloses that Barrall was employed only after careful investigation and upon satisfactory references. He was bonded in the amount of $2,500, which was greatly in excess of any one day's rental collection. He was carefully instructed to make daily deposits of the collections, which deposit was in the name of the estate and against which only the trustees could withdraw. He was directed to produce duplicate deposit slips for the prior month's collection at a regular meeting with the trustees which was held the second Wednesday of each month. At said meeting he was required to give a detailed rent statement for the prior month. The rent statement was prepared monthly by a secretary in the trustees' attorney's office from Mr. Barrall's individual rent cards. A comparison of the rent statements with the duplicate deposit slips showed them to be correct. The trustees made independent audits of the tenants' accounts at various times by letters asking the tenants to verify their respective accounts. The trustees acted with promptness and diligence when the defalcation was discovered. Under these

facts, and the pertinent law, the trustees should not be visited with reprisal because of their agent's infidelity and defalcation.

*Id.* at 243, 1958 WL 5160.

Pennsylvania law does recognize, however, that there may be circumstances in which a fiduciary can properly entrust matters to an agent-attorney and yet be liable for the agent's misconduct due to a failure to exercise proper supervision. Restatement (Second) of Trusts, § 225(2)(d). Indeed, the Pennsylvania Supreme Court in *In re Lohm's Estate,* 440 Pa. 268, 269 A.2d 451 (1970), so held. Relying upon the standard of care for fiduciaries found in Restatement (Second) of Trusts, § 225, the Supreme Court found that coexecutors of a probate estate were liable for the negligence of their counsel in failing to file required tax returns.

The Court in *Lohm's Estate* first set out the following standard against which the conduct of the co-executors of the estate was measured:

A fiduciary is required to use such common skill, prudence and caution as a prudent man, under similar circumstances, would exercise in connection with the management of his own estate.... [34] Of course, if he has Greater skill than that of a man of ordinary prudence, then the fiduciary's standard of care must be judged according to the standard of a man with his special skill.... Accordingly, Adair [an executor] being an attorney and Kunst [the co-executor] being a layman, it is reasonable to require Adair to comply with a higher standard of care than Kunst, but a lesser standard of care than Rosenbaum [the probate estate's tax at-

---

**34.** This is similar to the diligence standard used in the discovery rule: "qualities of attention, knowledge, intelligence and judgment which society requires of its members for the

protection of their own interests and the interests of others." *Fine v. Checcio,* 582 Pa. at 267, 870 A.2d 850.

torney] who, admittedly, had a great deal of experience with the types of tax problems which arose in this estate.

*Id.* at 273, 269 A.2d 451.

The trial court had held the two executors (and their attorney) guilty of supine negligence. The Supreme Court in *Lohm* agreed, concluding that the co-executors and their attorney were "equally and jointly at fault." *Id.* at 274, 275, 269 A.2d 451. In so deciding, the Court rejected the executors' defense of reliance upon counsel:

> The defense relied upon by Adair and Kunst was that they had no knowledge of the federal estate tax regulations, and that they relied entirely upon the advice of their counsel, Rosenbaum, for this aspect of the estate administration. The effect of relying upon the advice of counsel under these circumstances is well-settled in Pennsylvania. 'Where a fiduciary acts upon the advice of counsel, such fact is 'a factor to be considered in determining good faith, but is not a blanket of immunity in all circumstances'; (citing cases).' *Vandergrift['s] Estate,* 406 Pa. 14, 37 n. 17, 177 A.2d 432, 443 n. 14 (1962). There are two aspects to this 'factor' which must be weighed in deciding whether the fiduciary may defend against a surcharge attempt on the basis of reliance upon the advice of counsel. The initial choice of counsel must have been prudent under all the circumstances then existing, and the subsequent decision to rely upon this counsel must also have been a reasonably wise and prudent choice. *Vandergrift['s] Estate, Id.* at 37–38, 177 A.2d at 443; *Stirling's Estate,* 342 Pa. 497, 503–504, 21 A.2d 72, 75–76 (1941) (and cases cited therein). *See generally Restatement (Second) of Trusts* § 225 (1959); *Scott on Trusts* § 201 (1939).

*Id.* at 275, 269 A.2d 451.

Although the Court in *Lohm's Estate* found the executors' engagement of tax counsel appropriate, and further determined that their choice of experienced counsel, Rosenbaum, was also reasonable, the Court concluded that the executors' lack of oversight of their attorney-agent constituted supine negligence:

> Our examination of the instant record convinces us that both Adair and Kunst, acting in their fiduciary capacity, were guilty of supine negligence which contributed to the tax loss suffered by the estate. Both men should have been aware of, or, at least, should have taken steps toward ascertaining When [sic] the federal estate tax was due. Even though Adair was inexperienced in Fiduciary estate tax matters and Kunst was a layman unversed in the law, it was their duty as executors of the estate to ascertain the crucial date when the return should have been filed. The record shows that neither Adair nor Kunst made any effort to ascertain such date. A prudent man may not have the technical knowledge or skill to propare [sic] an estate tax return or even an income tax return, and so would properly rely on one more knowledgeable. But a prudent man in the conduct of his own affairs would certainly know that there is A[sic] time when a tax return must be made and a time when a tax is due and payable, and, if he did not know what those times were, he would find out.

*Id.* at 276, 269 A.2d 451.

Finally, in *Lohm's Estate,* the Court held that the executors' ignorance of the tax deadline and reliance upon counsel was not a viable defense to their inaction:

> Both executors in this case testified they did not know the time for filing the federal estate tax return, or the penalties for late filing. Assuming, Arguendo, [sic] that such ignorance did exist, we fail to conclude that this ignorance is completely excused by reliance on a law-

yer believed to be an expert. The matter of missing a tax return due date, a pivotal factor in connection with the administration of the entire estate, is not an error of law or of judgment for which the entire blame can be shifted to the expert. This was not a matter of acting on advice of counsel; it was a matter of neither knowing nor seeking to ascertain a key fact in the proper performance of a fiduciary function voluntarily undertaken.

*Id.* at 277, 269 A.2d 451.

After *Lohm's Estate* was decided, the Pennsylvania Supreme Court upheld the surcharge of probate executors for their failure to administer promptly their estate. *In re McCrea's Estate,* 475 Pa. 383, 380 A.2d 773 (1977). In so doing, the court again required the executors simply "to exercise the same degree of judgment that a reasonable person would exercise in the management of his own estate." *Id.* at 387, 380 A.2d 773. In applying this standard, however, the Court took into consideration that the executors were attorneys. *Id.* at 388, 380 A.2d 773.

■ Thus, under Pennsylvania law, a fiduciary's reliance upon the expertise of an agent, such as an attorney, to perform some fiduciary duties is permissible if the expert is necessary and if one with reasonable expertise is engaged. The degree of agent oversight required of the fiduciary will depend upon the nature of the engagement and the skills and knowledge of the fiduciary-client. Reliance upon the advice of counsel is a factor, but is not determinative.

## VI.

In insisting that he has met his burden of establishing due diligence, the trustee makes certain related arguments. First, he maintains that, given the particular circumstances and court orders in the Mushroom case, Arnold and the debtors acted with due diligence, even though they failed to detect for more than four years Ganz's misconduct. Second, the trustee contends that, even if the particular circumstances did not justify Arnold and Robert B. Cutaiar's inaction, there was no requisite "smoking gun" that would have alerted Arnold or Cutaiar to Ganz's embezzlement before Arnold was told of his former counsel's criminal activity by the United States trustee in February 1992.

The defendants' position is that "the personal relationship between Arnold and Ganz led Arnold to relax his fiduciary duty to collect and protect the debtors' assets." Defendants' Post–Trial Proposed Legal Conclusion, # 25. They also maintain that the proven facts reflect a general absence of due diligence by a fiduciary debtor in possession.

■ As will be discussed below, I find the defendants' position of a general absence of due diligence more persuasive. The evidence demonstrates that neither Arnold nor Robert B. Cutaiar engaged in any oversight of Ganz or the Pincus firms after the former Mushroom officers obtained full-time employment elsewhere in 1987. And while there was no smoking gun that would have revealed to them Ganz's criminal actions, that was wholly or partly due to their lack of involvement. At different points after July 1987, there were opportunities for Arnold (or Robert B. Cutaiar) to obtain information that would have revealed Ganz's theft, which opportunities a fiduciary exercising due diligence would have taken.

Moreover, after July 1987, there were actions or inactions taken by Ganz that a prudent client, especially a client who was himself an attorney, would question and cause suspicion. For example, the trustee maintains that the Pincus firm neglected to comply with the then Pennsylvania Rules of Professional Conduct, Rules 1.15

and 1.16 (effective April 1, 1988) concerning escrowed funds when the firm ceased operating in 1989, which non-compliance he argues constituted a breach of the law firm's fiduciary duty. Because I concluded that Ganz's theft constituted such a breach, it was unnecessary to rely upon the conduct rules to hold Pincus liable. But Arnold, an experienced Pennsylvania attorney, should have known of this non-compliance and, as will be discussed, it should have caused him to question the purported state of affairs.

Furthermore, the trustee overlooks the evidence on the docket that Astor, Weiss & Newman did enter an appearance in the Mushroom case in January 1990, and Arnold likely knew that Ganz was now employed by that new firm. Thus, even if Arnold was unaware of the duty of a law firm to account for escrowed funds when it ceases to represent a client, Arnold knew that the June 1987 court order only authorized Pincus to hold estate property in escrow, and Pincus was no longer operating. A prudent fiduciary would have questioned the continued validity of that court order.

I start first with the trustee's "smoking gun" contention, which stems from language in the Third Circuit's decision in *In re Mushroom Transp. Co.*, 382 F.3d at 342–43:

> We should stress that we do not hold here that the existence of a fiduciary, lawyer-client relationship between Ganz and Mushroom, and Ganz's abuse of that relationship, alone preclude judgment as a matter of law in PVHR's and its shareholders' favor. But as the district court noted in *Gurfein*, "the presence of a fiduciary relationship would be pertinent to the question of when a plaintiff's duty to investigate arose." 826 F.Supp. at 919 n. 31 (citation omitted). Ganz was no stranger to Mushroom and Arnold— he was Mushroom's lawyer, bound by

professional rules of ethics to the highest duties of honesty and probity in his dealings with his client. As the cases discussed above illustrate, the existence of a fiduciary relationship is relevant to a discovery rule analysis precisely because it entails such a presumptive level of trust in the fiduciary by the principal that it may take a "smoking gun" to excite searching inquiry on the principal's part into its fiduciary's behavior.

(footnote omitted).

The trustee contends that the Third Circuit has directed, given the fiduciary relationship between the Pincus firms and their debtor clients, that due diligence be found in this proceeding unless there existed a "smoking gun" that should have revealed Ganz's embezzlements to his clients' representatives, Arnold and/or Robert B. Cutaiar, and which they ignored. Further, he contends that there was no smoking gun.

I agree with the trustee that the evidence at trial did not reveal any such smoking gun. The Pincus defendants point to no evidence that definitively revealed to Arnold or Cutaiar Ganz's improper conduct, before the United States trustee so informed Arnold in February 1992. However, I do not interpret the Third Circuit's decision as requiring the existence of a "smoking gun" in this adversary proceeding given the proven facts; nor do I construe Pennsylvania law as so mandating.

For example, the Third Circuit in *Mushroom*, 382 F.3d at 341, refers favorably to *Schwartz v. Pierucci*, 60 B.R. 397 (E.D.Pa. 1986). In *Schwartz*, as described by the Court of Appeals "the [bankruptcy] trustee asserted claims against a bank in an effort to recover funds improperly drawn by principals and officers of the debtor from the debtor's account at the bank. The district court denied the bank's motion for

summary judgment, rejecting its contention that the statute of limitations barred certain of the claims against it." *Id.* at 340. The funds at issue were insurance proceeds that were payable to the corporate debtor pre-bankruptcy, but that the defendant bank permitted the individual corporate principals to receive. *Schwartz,* 60 B.R. at 402. The trustee brought suit against the bank under Pennsylvania's Uniform Fiduciary Act. *Id.* at 399. The bank argued that the trustee waited too long to sue it. The trustee maintained that the discovery rule tolled the statute of limitations.

In *Schwartz,* there was evidence that the bankruptcy trustee received two letters from a creditor's attorney requesting that the trustee investigate the possibility that the debtor would be collecting insurance proceeds, as well as the identity of the payee. 60 B.R. at 402. The letters themselves do not accuse the corporate officers (considered fiduciaries) of any wrongdoing. They are not smoking guns of improper activity. The letters were placing the trustee on notice of the existence of the insurance proceeds and the need to insure that the proceeds were properly distributed. Nonetheless, the district court in *Schwartz* observed that, at trial, the factfinder could possibly conclude that the bankruptcy trustee's failure to investigate creditor inquiries violated the trustee's obligation of due diligence for purposes of the discovery rule:

> In the letter dated March 26, 1982, counsel for the creditors asked that the trustee "investigate the likelihood that the debtor will be collecting the insurance proceeds." The letter of May 25, 1982 was a follow-up request that the trustee "investigate the payee of that insurance settlement." Both letters may have put the trustee on notice that some action was necessary on his part. It is undisputed that the plaintiff was acting as interim trustee when he received these letters.

*Id.* at 402. Thus, the court in *Schwartz* observed that, at trial, the defendant bank might prove the bankruptcy trustee's lack of due diligence, even though no smoking gun existed, if the letters, under the particular circumstances, "imposed a duty upon the trustee to investigate." *Id.* at 403.

Such a result is consistent with Pennsylvania law, which would apply the Restatement (Second) of Trusts § 225 as a standard of conduct for a bankruptcy fiduciary, such as a debtor in possession, in overseeing the acts of an agent-attorney. This standard does not require a smoking gun to exist. A lack of due diligence will arise when the fiduciary-client "does not exercise proper supervision over the conduct of the agent[attorney.]" *See Lohm's Estate.*

Indeed, the trustee's insistence that only the existence of a "smoking gun" can demonstrate a lack of due diligence when dealing with fiduciary misconduct cannot be correct in every instance when the injured party is also a fiduciary. Compare the facts of *Rubin Quinn Moss Heaney & Patterson, P.C. v. Kennel,* 832 F.Supp. 922 (E.D.Pa.1993) (also referred to favorably by the Third Circuit in *Mushroom,* 382 F.3d at 342), which involved the theft of funds by an attorney and a successful attempt to hold that attorney liable to repay his law firm.

In *Rubin,* the attorney who embezzled client funds was found to be acting in a fiduciary capacity for the law firm. And the law firm was acting in a fiduciary capacity to its clients. The attorney in *Rubin* was able to embezzle funds from law firm escrow accounts because the law firm employed deficient internal and external auditing procedures of those accounts. Although deficient, however, there was some firm oversight of these accounts, al-

beit not aggressive. *Id.* 832 F.Supp. at 935, 936. The theft was uncovered after a senior member of the firm was notified by a bank official that the firm account was overdrawn. *Id.* at 928. That notification could be made because the bank accounts were in the name of the law firm. *Id.*

In this adversary proceeding, all of the bank accounts with stolen Mushroom assets were in the name of Ganz, and so no revelatory information directly from a banking source to Arnold could ever be forthcoming, as had occurred in the *Rubin* case. Virtually all the corporate officers of Mushroom had left and Arnold and Robert B. Cutaiar, employed elsewhere, had adopted a limited, passive role, acting only when so requested by Ganz and receiving information primarily from Ganz. Under those circumstances, if Arnold had no obligation to demand documentary corroboration from Ganz about the funds held in escrow, absent a smoking gun,[35] there were only two possible types of smoking guns: Ganz is overcome with contrition and so confesses to Arnold; or a third-party discovers Ganz's misconduct and tells Arnold.[36]

If only definitive evidence of Ganz's theft could trigger the statute of limitations, and if no party in interest, such as the United States trustee, had acted independently, and if the chapter 11 cases of Mushroom and its affiliates had remained dormant (awaiting a consensual resolution of the substantive consolidation issue that had been known to Arnold since 1986), the trustee's "smoking gun" contention would mean that the statute of limitations would be tolled indefinitely until Ganz or some third party revealed his theft of the es-

tate's assets. That result seems counter-intuitive because of the fiduciary obligations of Arnold and the chapter 11 debtors to creditors of the bankruptcy estate. Permitting an inordinate delay in administering the estate could itself represent a lack of due diligence under Pennsylvania law. *See generally In re McCrea's Estate,* 475 Pa. 383, 380 A.2d 773 (1977).

Accordingly, I shall focus upon the actions taken by, and the circumstances known to, Arnold and Robert B. Cutaiar, the two individuals responsible for the chapter 11 debtors in possession, to determine whether they exercised appropriate oversight under the specific circumstances of these bankruptcy cases. And in so doing, the trustee does not gain the benefit of all reasonable factual inferences, as had existed in the summary judgment phase of the litigation. Indeed, the evidentiary burden at trial was on the trustee to demonstrate by a preponderance of the evidence the due diligence of his predecessors in interest.

Pennsylvania law would consider as relevant that the debtors in possession had two experienced, sophisticated individuals acting on behalf of the corporation as of 1987: Arnold and Robert. B. Cutaiar. The former was a licensed attorney since 1978, who had taken a law school bankruptcy class, who had been the chief operating officer of a trucking company, and who had agreed to serve as a liquidation consultant and later as chapter 7 trustee. The other representative of the estate was the corporate treasurer in charge of fiscal records who had been with the corporation since 1961. Pennsylvania law would also consid-

---

**35.** Obviously, the bank statements themselves would reveal Ganz's theft, as therefore would constitute a "smoking gun."

**36.** And if Arnold and Robert B. Cutaiar had completely ceased involvement in the Mush-

room cases, as did the other corporate officers, presumably there would have been no one acting for the chapter 11 debtors to ever see the smoke from those two hypothetical sources.

er relevant the nature of the duty delegated by the fiduciary to the agent: here, simply the retention and preservation of sales proceeds, and not legal advice.[37]

Clearly, the debtors in possession acted reasonably in retaining bankruptcy counsel, and in choosing the Pincus firms for such counsel. Second, to the extent that the debtors had delegated to their counsel the duty to collect and preserve estate property for a temporary, finite period of time, such a delegation would be reasonable. Indeed, I had issued a court order in June 1987 approving a stipulation with the concurrence of the official creditors' committee to that effect.

At the time the June 1987 stipulation was approved, however, I did not know that all of Mushroom's officers, except Arnold and Robert B. Cutaiar, had ceased their involvement with the debtors. They knew that. Nor did I know at that time that the debtors had moved out of Philadelphia, and that Arnold and Robert B. Cutaiar were employed full-time elsewhere, and that the two remaining debtor/officers and employees had decided to allow Ganz to handle the administration of the chapter 11 cases, unless he called upon them for assistance. They also knew that. (Clearly, all parties in interest did not know it, as the United States trustee later tried to serve a Mushroom affiliate at its former location.) I did not know that, at the time of the June 1987 stipulation, no Mushroom representative had agreed to permit Pincus to hold the funds, and that Ganz had done this on his own. By February 1988, Arnold knew that. And, unlike the order directing Continental to hold funds in escrow, the June 1987 settlement did not authorize the Pincus firm to hold the funds in escrow pending a determination of substantive consolidation. Apparently, Arnold later acquiesced that the law firm or Ganz should do so.

The trustee argues that the failure to disclose the debtors' new address was a mere oversight and of minor consequence, since there was very little administration of the chapter 11 cases necessary after the assets were liquidated and until the substantive consolidation motions were determined. I can accept that the debtors' lack of notification of a new address was unintentional. The justification by the trustee of a lack of client involvement after 1986 is less persuasive. Not only should Arnold, as an attorney and as the special liquidating consultant, appreciate that a fiduciary cannot remain uninvolved in fulfilling its obligations, he should also have known that a client must give direction to its counsel in certain matters.

In arguing that the facts demonstrate the existence of due diligence in discovering the bankruptcy estate's claims against the Pincus firms—*viz.* Ganz's thefts of Mushroom assets—the trustee relies upon the decision of the Third Circuit Court of Appeals, *In re Mushroom Transp. Co.,* 382 F.3d 325 (3d Cir.2004), which decision found persuasive an earlier decision of District Court Judge Reed in *In re Mushroom Transp. Co.,* 247 B.R. 395 (E.D.Pa. 2000). Judge Reed held, and the Third Circuit agreed, that for purposes of summary judgment, giving the trustee the benefit of all inferences, the undisputed facts did not warrant a finding as a matter of law that there was an absence of due diligence.

---

**37.** This factor distinguishes the application of the discovery rule in legal malpractice actions, where, if one were to assume that the client should know that advice was improper as soon as it was given, the client impractical-

ly "would have to hire a second attorney to observe the work of the first." *Willis v. Maverick,* 760 S.W.2d 642, 646 (Tex.1988). Here, oversight of an agent holding estate property requires no particular expertise.

For purposes of summary judgment, the Court of Appeals noted five aspects of this dispute, now emphasized by the trustee that, taken together, could persuade a fact-finder that the chapter 11 debtors acted with due diligence: the fiduciary relationship between Pincus and Ganz and their clients; the provisions of the Bankruptcy Code, such as section 327, that allow an attorney to assist a trustee or debtor in possession with its duties, including the preservation of estate property; the fact that there would be no distribution of assets until substantive consolidation had been resolved; that Ganz had orally responded to Arnold's February 1988 request for information about the Mushroom assets; and the June 1987 court order approving retention of property by Pincus and the September 1987 order terminating the duty to file operating reports. *In re Mushroom Transp. Co.*, 382 F.3d at 340–342.

The evidence adduced at trial, including an examination of the docket entries and court filings, places a different construction on the conduct of Arnold and Robert B. Cutaiar from that gleaned by the Third Circuit simply from affidavits and from giving the trustee the benefit of all factual inferences.

First, the evidence makes it likely that Arnold and Robert B. Cutaiar ceased any oversight of the Mushroom bankruptcy cases in early 1987 and allowed the Pincus firm, and thus Ganz, a free hand to manage the chapter 11 cases as he saw fit. They might attempt to be responsive to inquires or requests for counsel assistance, but they did not initiate actions, give direction to counsel, or seek information. Furthermore, the decision to have only limited involvement occurred months prior to the June 1987 settlement agreement by which Pincus was to act as escrow agent, and thus was not based upon any court direction that the law firm would protect the assets.

I appreciate that Arnold was involved in certain creditor-claims issues and in drafting a proposed chapter 11 plan and disclosure statement. And Robert B. Cutaiar signed the substantive consolidation settlement on behalf of the affiliate debtors. But the trial revealed that a key element to Ganz's successful embezzlement for more than four years was that Arnold and Robert B. Cutaiar were involved only in those matters that Ganz felt were necessary. For example, Arnold was not troubled when Continental ceased sending monthly bank statements after October 1986. And Arnold could not persuasively explain why, especially after the August 1988 ruling on pension liability, he did not press his counsel to have an adjudication on substantive consolidation. Further, even the debtors' proposed chapter 11 plan was filed in 1990 only due to pressure from the United States trustee through a motion to convert, pressure which Arnold likely learned of from Ganz.

Therefore, Arnold's suggestion that he was properly concentrating only on objections to claims and awaiting the outcome of consolidation before seeking control of the Mushroom assets should be considered in the context that Ganz probably limited his focus. Arnold did not concern himself with obtaining a prompt resolution of the substantive consolidation motion because Ganz did not tell him to do so. And while reliance upon the advice of counsel is often diligent, certainly by August 1988, after the ruling on Mushroom common ownership and with the consolidation motion having been pending for more than two years, Arnold's waiting almost four more years for a consensual resolution bespeaks more of an absence of diligence than justifiable reliance.

Second, the court order in September 1987, approving the cessation of operating reports for the chapter 11 debtors did not render discovery of Ganz's thefts more difficult for Arnold or anyone else. These reports had ceased months before the September order, and those that were filed provided absolutely no information about estate funds held in escrow.

Third, the evidence also does not support the trustee's contention that the Mushroom cases were largely dormant for years due to the pending, challenged substantive consolidation motion. After March 1987, numerous contested matters, settlements and adversary proceedings were being filed by Ganz, at least some of which Arnold and Robert B. Cutaiar appear to have had no knowledge. And as to some, such as the Continental settlement, Arnold found out long after the fact. Rather than exercising due diligence, the debtors' lack of participation and oversight in these cases, as well as the lack of oversight from his fellow Pincus attorneys, allowed Ganz to commit his crime undetected.

Fourth, the implication that Arnold's February 1988 letter requesting information from Ganz about the Mushroom escrow account was promptly and clearly responded to, albeit orally, is probably not accurate. The evidence supports the likelihood that Ganz orally responded many months later and only in vague terms. Furthermore, the absence of a timely response from Ganz in February 1988 should be contrasted to Ganz's timely, written response to Arnold's letter in February 1987, as well as other diligent actions taken by Ganz in 1986. During 1988, Arnold failed to insist on a detailed report of the debtors' assets held by Ganz, as a prudent fiduciary would.

Fifth, in addition to Ganz's lack of timely oral or written response to Arnold's February 1988 letter, the evidence at trial demonstrated that there were other indicia of which Arnold was aware that should have concerned a diligent fiduciary: the absence of bank statements since October 1986; the fact that Ganz seemed to be acting without consultation with Arnold; that Ganz changed law firms in 1989 when the Pincus firm ceased to operate and yet still maintained control over Mushroom's assets, even though there was no court order releasing the Pincus firm as escrow agent; that there was no accounting for Mushroom's escrow account by the Pincus firm, as required by the Pennsylvania Rule of Professional Conduct 1.15 and 1. 16, when the firm ceased operating; that the debtors would ultimately be filing tax returns, but necessary fiscal information, such as postpetition interest earned, was not being provided; that the substantive consolidation motion had been pending since 1986 without any request for court resolution; and that the amount of estate property represented as available for distribution in the April 1990 disclosure statement signed by Arnold, $1.6 million, was considerably larger than the rough amount Ganz claimed he orally told Arnold was available. None of these facts was investigated by Arnold.

Finally, Arnold's assertion that he was concerned with protecting the Mushroom funds and relied upon the integrity of debtor's counsel to do so is significantly weakened by his actions after he was elected chapter 7 trustee in February 1991. Although he had been given information from the United States trustee about the duties of a chapter 7 trustee, Arnold never sought control of estate property, even though he knew or should have known that Ganz no longer represented the bankruptcy estate; and he never demanded the funds from Ganz immediately before or after the substantive consolidation motion was settled. Either of these actions could have resulted in discovery of Ganz's mal-

feasance. Moreover, Arnold as trustee never even engaged counsel and was content to let Ganz continue to negotiate on behalf of the estate.

Although I am unable to accept the defendants' explanation that Arnold's inaction stemmed primarily from his friendship with Ganz, that may have been a factor. The greater factor probably stemmed from the lack of financial interest that Arnold and Robert B. Cutaiar had in the outcome of the Mushroom bankruptcy cases, which lack of interest probably became apparent to them when Mushroom ceased operating, the IRS did not bring suit against them, the affiliate companies were held responsible for Mushroom's pension fund liabilities, and the officers needed to earn income from other sources. This resulted in their decision to greatly reduce their involvement in the chapter 11 cases.

The facts of this proceeding are somewhat analogous to those faced by an Illinois state court concerning the due diligence of a fiduciary whose attorney stole funds, while telling the fiduciary-client that the property was preserved. In *In re Hartzell's Will*, 43 Ill.App.2d 118, 192 N.E.2d 697 (1963), an Illinois appellate court found a probate trustee liable for the theft by the trustee's attorney of the proceeds of sale of realty. The trustee had given counsel a signed deed in advance of settlement, did not attend the settlement, and allowed counsel to retain the purchase price for years prior to discovery of the embezzlement. *Id.* at 140, 192 N.E.2d 697. Of course, when the discovery of the theft was made by someone other than the trustee, the stolen funds had already been dissipated.

In concluding that the trustee did not act diligently the court explained:

> The testimony of Spaulding [the attorney] is that he told Rici [the purchaser of the realty] to make out the check for the balance of the sale money, approxi-

mately $10,000.00, to Spaulding, and it was so done, Spaulding kept it, the trustee knew he had it, the trustee talked to Spaulding about it on numerous occasions, Spaulding told the trustee he was using it and paying interest to Ida Hartzell, he did not pay the principal to the trustee, the trustee did not ask where it was invested, and the only demand Spaulding ever received for it was in January, 1961, nearly two years later, and that was not from the trustee. Spaulding said he, in the ultimate, had received not only that Rici check for the then principal balance as of March 10, 1959, about $10,000.00, but all the rest of the prior principal payments on account, (the approximately $4653.80 so paid by Rici up to and as of March 10, 1959). To the extent of the $10,346.20 then unpaid balance, as of March 10, 1959, of the principal part of the $15,000.00 sales price of this real estate per the Agreement of June 12, 1955, adopted, in effect, by the trustee, the trustee clearly did not, in acquiring, investing, reinvesting, selling or managing the property, exercise the judgment and care under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds. The trustee was under a duty to the beneficiaries to administer the trust in accordance with the provisions of the trust instrument, which he did not do. He had no power to delegate the trust. He was under a duty not to delegate to others the doing of acts he could reasonably be required personally to perform, but instead, delegated to Spaulding the single most important item in this trust, obtaining the $10,346.20 unpaid balance of principal from Rici upon closing the sale,—a non controversial, simple, basic matter not

requiring any particular legal assistance, and certainly not requiring the sole attention of the lawyer to the exclusion of the trustee, and requiring, in fact, the personal action of the trustee as a normal, uncomplicated business matter. He did not exercise any general supervision over the conduct of Spaulding even to whatever extent the trustee may be said to have properly delegated some ministerial phase of the matter to him, such as the technical legal job of preparation of the deed itself, or the attendance, as such, of Spaulding at the closing to care for and advise the trustee on the normal routine legal matters incident thereto. He did not exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property. He took no reasonable steps to take and keep control of the trust property, or to preserve it, or to make it productive. He permitted a wholly unnecessary and unreasonable delay in obtaining possession of the trust property. That was his primary initial duty. Otherwise the trust could not be executed. He could not remain dormant then and for nearly two years with impunity.

*Id.* at 140–42, 192 N.E.2d 697.

Other than the fact that Ganz obtained the estate funds from Continental by misusing a settlement agreement, a settlement of which his client was unaware but later ratified, and that it took almost five years to discover his theft, many of the circumstances in the *Hartzell* case are similar to those in this proceeding: oral representations from attorney to client; the embezzlement of sale proceeds; the ceding of certain responsibilities to counsel; the trustee's failure to request corroboration from his attorney for years; and the discovery of counsel's theft by a third party.

As did the Illinois court, on the proven facts I cannot conclude that the trustee met his burden to demonstrate due diligence.

If in February 1987, when Arnold and Robert B. Cutaiar informed Ganz that they would be employed elsewhere, the Mushroom debtors had directed Pincus to seek appointment of a bankruptcy trustee because no corporate officers would be involved with these cases, there likely would have been no theft.

If in February 1988, when the creditors' committee requested an accounting of Mushroom assets from Arnold who forwarded that request to Ganz, Arnold had insisted on a full report from Ganz (as Rule of Professional Conduct 1.15 and its predecessor, Pennsylvania Disciplinary Rule 9–102, entitled him to receive) with information that could be corroborated, the theft would have been uncovered and some of the stolen property preserved for the estate.

If Arnold had asked in 1989 for an accounting from the Pincus law firm of funds purportedly held by the firm in escrow, when the firm ceased to operate, Ganz's embezzlement would have been quickly revealed. If in 1990 Arnold had required Ganz to corroborate the disclosure statement representation that there was $1.6 million in estate assets, more than had been estimated previously, the theft would have become apparent.

And if Arnold, upon becoming chapter 7 trustee in February 1991, had exercised his statutory duty to recover property from former counsel, Ganz's theft would have been immediately exposed. The statute of limitations on the contract claim expired in the summer of 1991.

As noted in factual finding # 83, by September 1988—more than four years before the commencement of this proceeding—there were numerous signs that would have caused a prudent person, acting as a

fiduciary, to seek corroboration about estate funds, and in so doing uncover Ganz's embezzlement. Therefore, based upon the evidence presented and the evidentiary burdens, I conclude that the trustee/plaintiff has not presented sufficient evidence of due diligence to obtain the benefit of Pennsylvania's discovery rule. Given the proven facts, by September 1988, a diligent person with Arnold's intelligence and background, and acting in a fiduciary capacity "to protect his own interests and the interests of others," *Fine v. Checcio,* would have asked his attorney for evidence of the preservation of estate property. Had he done so, Ganz's misconduct would have been discovered. Thus, the statutes of limitations on Counts II and VI would begin to run no later than that date.

Accordingly, the trustee's claims against the Pincus law firm defendants are barred as untimely filed.

## VII.

None of the attorneys or parties in interest in the Mushroom cases, including the United States trustee and this court, can be pleased with their lack of action during the chapter 11 phase of these cases. The bottom line is that almost $700,000 was stolen and only a small fraction has yet been recovered. And that modest recovery will probably be distributed as attorney's fees due to the numerous lawsuits these cases have spawned.

These chapter 11 cases started in 1985 when the Bankruptcy Reform Act was fairly new. The United States trustee did not exist in this district at the time of commencement; the position was established as part of the "Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986." Pub.L. 99–554. *See, e.g., Balser v. Department of Justice, Office of U.S. Trustee,* 327 F.3d 903, 909 (9th Cir.2003), *cert. denied,* 541 U.S. 1041, 124 S.Ct. 2159, 158 L.Ed.2d 729 (2004). Since then, there has been great improvement in the administration of chapter 11 cases in terms of oversight, monthly operating reports, and protection of estate property.

For example, in *In re Insilco Technologies, Inc.,* 480 F.3d 212 (3d Cir.2007), the Third Circuit Court of Appeals described the current rationale for using chapter 11 to liquidate assets in these terms:

While we typically think of Chapter 11 as the "reorganization" section of the Bankruptcy Code (as opposed to Chapter 7, the "liquidation" section), it is not uncommon for debtors to use the Chapter 11 process to liquidate. This is because Chapter 11 provides more flexibility and control in determining how to go about selling off the various aspects of the debtor's business and distributing the proceeds. A typical mechanism for effecting a Chapter 11 liquidation is the creation of a "liquidating trust"—a state-law trust managed by a group of creditors that succeeds to the debtor's assets and administers the liquidation and distribution process.

*Id.,* 480 F.3d 212, 2007 WL 823849, at *1 n. 1.

A liquidating trust managed by creditors would have prevented the misappropriation that occurred in these cases. Unfortunately, in the Mushroom cases, and the early days of chapter 11, although there was an official creditors' committee and other creditors initially active in the case, no liquidating trust was considered, nor was a chapter 11 trustee appointed. Instead, the debtor was left in nominal charge of the chapter 11 case, its officers left for other employment and so provided no oversight, the creditors' committee became inactive, and the law firm appointed as debtors' counsel allowed a member of its firm to act unfettered. The law firm is clearly liable for its member's theft. But

interests of finality expressed by the statute of limitations trump that liability.

An appropriate judgment shall be entered.

## ORDER

AND NOW, this 3rd day of May 2007, for the reasons stated in the accompanying opinion, it is hereby ordered that judgment on counts I, II and VI of the amended complaint shall be entered in favor of the defendants Pincus, Verlin, Hahn & Reich, P.C.; Pincus, Reich, Hahn, Dubroff & Ganz, P.C.; and Pincus, Verlin, Bluestein, Hahn & Reich, P.C. and against the plaintiff.